UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                                      :
DAVID JONES, ISSAC NELSON, KEVIN MARTIN,              :
WILLIAM MEACHEM, CLARENCE SUBER,                      :
TOBIAS WALLS, HENRY MORENO, JAMES WHITE,              :
RAMON BLAS, ANGELO CARAVAGGIO,                        :
ROY DAVIS, LUCIANO ORTIZ, RORY DOLAN,                 :
LIBERATO BERMUDEZ, GREGORY SMITH,                     :
FRUITQUAN BAILEY, TODD BROCKINGTON,                   :
RENALDO RIVERA, JAMES DIXON, _____                :
JUAN PERDOMO, HERBERT JUNIOR,                         :
HECTOR LOPEZ, JUAN RIVERA, DWAYNE FAUST,              :
and all others similarly situated,                    :
                                                      :
                        Plaintiffs,                   :
                                                      :          95 Civ. 8026  (GEL)
            -against-                                 :          _____
                                                      :
GLENN S. GOORD, Acting Commissioner of the New        :          **OPINION AND ORDER**
York State Department of Correctional Services,       :
EDMUND WUTZER, Chairperson of the New York State      :
Commission of Correction, THOMAS J. GOLDRICK,         :
Commissioner of the State Commission of Correction,   :
FLOYD BENNETT, Superintendent of Elmira Correctional  :
Facility, HANS WALKER, Superintendent of Auburn       :
Correctional Facility , ROBERT H. KUHLMANN,           :
Superintendent of Sullivan Correctional Facility,     :
DAVID MILLER, Superintendent of Eastern Correctional  :
Facility and CHRISTOPHER ARTUZ, Superintendent of     :
Green Haven Correctional Facility,                    :
                                                      :
                        Defendants.                   :
-----------------------------------------------------------------------x

Eric H. Queen, Fried, Frank, Harris, Shriver &
Jacobson LLP, New York, New York, for Plaintiffs.

Eliot Spitzer, Attorney General of the State of
New York (by Barbara K. Hathaway, Barbara D.
Maddox, Steven L. Banks, and Steven N. Schulman,
Assistant Attorneys General), New York, New York,
for Defendants.

GERARD E. LYNCH, <u>District Judge</u>:

In this class action, plaintiffs challenge New York State's administration of a program for double-celling in its maximum-security prisons. Double-celling is a practice in which two prisoners are housed in a cell originally designed for one person. Plaintiffs claim that defendants' practice of double-celling some New York inmates violates the First and Eighth Amendments. With respect to plaintiffs' Eighth Amendment claims, it is clearly established that double-celling, even in maximum security prisons, does not in itself constitute cruel and unusual punishment. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 339, 349-50 (1981). Plaintiffs nevertheless contend that the manner in which double-celling is carried out in New York violates the Constitution, because the practice results in "depriv[ing] inmates of the minimal civilized measure of life's necessities," <u>id</u>. at 347, and demonstrates that the New York authorities have been deliberately indifferent to the health and safety of inmates in their charge. <u>See</u> <u>Wilson v. Seiter</u>, 501 U.S. 294, 303-05 (1991).

This litigation has a long history. The complaint was filed in 1995, making it one of the oldest active cases on this Court's individual docket, and the case has been assigned to several judges over the years. The case was effectively stayed for some time pending litigation of a companion case challenging the same practice in medium security prisons. After a full trial on the merits, Judge Stein denied the plaintiffs in that case any relief, in a lengthy and careful opinion. <u>See</u> <u>Bolton v. Goord</u>, 992 F. Supp. 604 (S.D.N.Y. 1998).

On September 27, 1999, Judge Pauley dismissed portions of plaintiffs' second consolidated amended complaint, and granted in part plaintiffs' motion for class certification as to the remaining claims. <u>Jones v. Goord</u>, 190 F.R.D. 103 (S.D.N.Y. 1999). With respect to

plaintiffs' demands for injunctive relief, the Court certified a class of all prisoners who have been double-celled in the subject facilities, and divided the double-celling class into thirteen subclasses, one for each of New York's maximum security institutions. Id. at 111-13. The Court, however, declined to certify a class or classes with respect to claims for damages, holding that "it is neither feasible nor desirable to determine monetary damages on a class-wide basis." Id. at 113. A third consolidated and amended complaint was filed in November 1999, addressing some of the deficiencies noted in Judge Pauley's decision, and extensive discovery followed, punctuated by occasional disputes requiring judicial intervention. See, e.g., Jones v. Goord, No. 95 Civ. 8026, 2002 WL 1007614 (S.D.N.Y. May 16, 2002) (denying plaintiffs access to certain electronic databases). For the most part, discovery focused on four institutions – Attica, Clinton, Great Meadow, and Green Haven – which have been treated as exemplary. Even with this limitation, the discovery process has been exhaustive and expensive, and has consumed the energies of numerous attorneys and support staff on both sides, over a period of years.

By the spring of 2003, the parties had finally completed discovery. On the elaborate record thus compiled, defendants now move for summary judgment both as to plaintiffs' class claims and individual plaintiffs' claims for damages.[1] Briefing of the motions took over a year,

---

[1] The status of plaintiffs' fourth cause of action – an Eighth Amendment claim on behalf of all inmates of Green Haven – is unclear. In his September 27, 1999, opinion, Judge Pauley expressly refused to dismiss plaintiffs' fourth cause of action, Jones, 190 F.R.D. at 109, which he described as a claim that "the general conditions of confinement at Green Haven Correctional Facility violate [plaintiffs'] rights under the Eighth and Fourteenth Amendments," id. at 106. However, plaintiffs' fourth cause of action refers to a class of plaintiffs described as "the Green Haven Conditions Plaintiffs." (Compl. ¶ 147.) Judge Pauley's September 27, 1999, opinion certified no such class, and neither has any subsequent opinion of this Court.

The parties, for their part, seem to have completely forgotten about the fourth cause of action as a separate claim. Outside of the double-celling claims, neither party discusses any claim regarding the general conditions of confinement at Green Haven, and neither party

with frequent requests for extensions of time. The motion was fully briefed by August 2004, and is now ripe for decision. Defendants' motion will be granted with respect to plaintiffs' class claims and plaintiffs' claims for injunctive relief, and the Court will reserve decision with respect to individual plaintiffs' claims for damages.

## BACKGROUND

New York State operates the fifth largest correctional system in the nation. (Def. R. 56.1 Stmt. ¶ 8.) At the time defendants' motion for summary judgment was filed, approximately 65,400 inmates were in the custody of the New York Department of Correctional Services ("DOCS"). (Id.) Like many prison systems across the country, New York began to see a large increase in its prison population in the late 1980s and early 1990s, and state prisons at that time were often unable to accept inmates from local jails in a timely manner. (Id. ¶¶ 15, 17, 18.) These delays led to numerous lawsuits by various counties and municipalities, and DOCS began to discuss double-celling as a solution to the problem. (Id. ¶¶ 18-20.) After researching double-celling policies in other jurisdictions, DOCS developed a double-celling policy for New York. (Id. ¶¶ 21-26.) In mid-1995 that plan was implemented in the thirteen maximum security prisons at issue in this litigation. (Id. ¶ 27.) Those thirteen prisons contain approximately 20,000 cells, 796 of which have been converted to double cells. (Id. ¶ 2, 29.) Those 796 cells are the focus of this litigation.

While the record does not contain evidence regarding each and every one of the 796 double cells at issue, plaintiffs' expert Vincent Nathan toured the four exemplary institutions and describes the double cells he observed. (See Zilberberg Decl. Ex. B [hereinafter Nathan Rep.].)

_____

discusses the existence, or lack of existence, of any "Green Haven Conditions" class.

For purposes of this motion, Nathan's descriptions of the cells will be accepted as accurate, and the following descriptions are taken from his report.[2]

Generally, Nathan describes the double cells as "well-maintained," but also "claustrophobic, relatively dark, and cluttered with furnishings and personal property." (Id. 11.) Most of the cells have between 48 and 60 square feet of floor space, a "significant" portion of which is consumed by "bulky" metal bed frames. Nathan reports that in several cells he examined, he and his partner had a difficult time moving within the cell at the same time. (Id. 19-20.) Because most of the cells are in the interior and toward the front of the cellblock, natural light is available for the most part only from windows on the outer walls of the cellblocks.

Green Haven has 102 double cells, located toward the front of the cellblocks closest to the guards' station. Each double cell has 55 square feet of floor space and the following furnishings: a bunk bed 32 inches wide, 6 feet 8 inches long, and 6 feet high; two lockers, each 12 inches wide, 18 inches deep, and 7 feet high; a sink and a toilet; a fan on a shelf in the corner; a single fluorescent overhead light; an electrical outlet; and one or two radios. No double cell at Green Haven has a window, but all double cells face a walkway which has a bank of windows.

Nathan reports that there are 32 total double cells in Clinton – 26 in Clinton Main and 6 in Clinton Annex. Just as in Green Haven, the double cells are located toward the front of the cellblocks nearest the guards' station. All double cells in Clinton Main have 51 square feet of floor space and the following furnishings: a bunk bed 32 inches wide, 6 feet 8 inches long, and 6 feet high; two lockers, each 18 inches wide, 16 inches deep, and 4 feet high; a sink and a toilet; two personal fans; a single fluorescent light on the back wall; one electrical outlet; one television

_____

[2] See Nathan Rep. 10-19.

5

provided by DOCS; one or two radios; and a fold-down writing surface (with the exception of cells in Lower F cellblock). The double cells in Clinton Annex are similar, but have 80 square feet of floor space, a window, a fluorescent ceiling light, a small shelf on the wall opposite the bed, and no television.

There are 81 double cells in Great Meadow, and, as in the other prisons, all are located at the end of the cellblocks toward the guards' station. Double cells in C block and D block have 55 square feet of floor space, while the double cells in E block have approximately 50 square feet. All double cells in Great Meadow have the following furnishings: a bunk bed 32 inches wide, 6 feet 8 inches long, and 6 feet high; two lockers, each 15 inches wide, 16 inches deep, and 2 feet high; a sink and a toilet; one or two personal fans; a single fluorescent light; two clip-on lights; one electrical outlet; two televisions provided by DOCS; and one or two radios. All double cells face a walkway and a bank of windows, which provide natural light, although Nathan reports that the windows were dirty at the time of his visit to Great Meadow.

Attica has 107 double cells. Again, all double cells are located toward the front of the cellblocks near the guards' stations. Double cells in A block, B block, and D block have 48 square feet of floor space. Double cells in C block and the honor block have 60 square feet of floor space. Double cells in E block have approximately 65 square feet of floor space. All cells are generally rectangular in shape, with the exception of the honor block cells, which are L-shaped, creating "some additional degree of physical separation" for the cellmates. (Id. 18.) The double cells in C block, while rectangular, have a small alcove in which a bunk bed can fit. All double cells in Attica have the following furnishings: a bunk bed 32 inches wide, 6 feet 8 inches long, and 6 feet high; two lockers, each 15 inches wide, 16 inches deep, and 2 feet high; four

plastic storage bins; a sink and a toilet; two clip-on fans; two clip-on lights; one fluorescent light; one electrical outlet; a television provided by DOCS; and one or two radios. The honor block has additional amenities, including a recreational room with a color television, a ping pong table, cooking equipment, an iron, and additional seating.

Before being placed in any cell, single or double, an inmate must first go through a screening process. Plaintiffs dispute the extent to which the DOCS screening policies are followed, both as a general matter and in specific instances, but the policies themselves are not in dispute.[3] Plaintiffs' claims that the below-described procedures are not followed in DOCS facilities will be addressed later in this opinion.

When an inmate is first committed to DOCS custody he is sent to a reception facility for a review of his social background, criminal history, and behavior during prior incarcerations. Inmates are then given a medical examination, including a medical history, a physical examination, various screenings, blood work, a chest x-ray, a PPD test for tuberculosis, a test for hepatitis B and C, an optional HIV test, various immunizations, and a mental health assessment.[4] After this initial screening, DOCS maintains a record of each inmate's health and behavior. This

_____

[3] Defendants' Rule 56.1 Statement often uses words such as "extensive" and "thorough" when describing the review process. (See, e.g., Def. R. 56.1 Stmt. ¶¶ 30, 31.) Plaintiffs generally "deny" these assertions to the extent that they characterize the review process in a positive light. In adopting the defendants' description of the actual processes used to screen inmates, the Court does not adopt the defendants' normative valuations of those processes.

[4] Plaintiffs deny a portion of this assertion based on the deposition of James Stinson, the superintendent of Great Meadow. Plaintiffs cite to Stinson's testimony that "[inmates] are interviewed by medical staff. . . . Medical examinations take place later on. If there needs to be a medical examination, that takes place later on." (Stinson Dep.109.) However, this portion of Stinson's deposition describes the procedures used when new inmates arrive at Great Meadow, not when they arrive at DOCS reception facilities, and therefore it does not contradict the assertions regarding reception screening in defendants' Rule 56.1 Statement.

record includes unusual incidents ("UIs"),[5] disciplinary violations, medical treatment received, chronic medical problems, medications, and test results, such as the annual tuberculosis test.

Before an inmate is placed in a double cell, DOCS performs further screening. DOCS policy provides that inmates are not to be placed in a double cell if they have serious mental health problems, and inmates with less serious mental health problems can only be double-celled after close review. Inmates whose records indicate that they are victim prone, are assaultive, have a history of extreme violence, or have a history of homosexual behavior are not to be double-celled, unless more recent history shows that a particular inmate has improved or adjusted. Inmates taller than 6 feet, 5 inches or heavier than 299 pounds are not to be double-celled, and inmates older than 70 years old are not to be double-celled unless they volunteer. Prison medical staff screen inmates for communicable diseases or physical disabilities before an inmate can be placed in a double cell, and based on this screening the medical staff may conclude that an inmate should not be double-celled. DOCS policy allows HIV-positive inmates to be double-celled if they meet the general criteria. Inmates with a record of good behavior over the previous two years are exempt from mandatory double-celling, but may be double-celled on request if they otherwise meet the criteria.

Once an inmate is assigned to a double cell, he may not be double-celled for more than 60 days unless he consents to continued double-celling. However, because DOCS can move inmates to different prisons within the New York prison system, inmates often consent to remain in a double cell because refusing to do so could result in transfer to a less preferable prison

_____

[5] DOCS uses the term UI to refer to serious events including "major disturbances at the facility, inmate deaths, or serious inmate assaults involving the use of weapons and/or serious injury to the inmate." (Def. R. 56.1 Stmt. ¶ 63.)

farther away from New York City.[6]

## DISCUSSION

I. <u>Representation of Subclasses</u>

As an initial matter, defendants argue that two of the injunctive relief subclasses – the Great Meadow subclass and the Clinton subclass – have no named plaintiff representatives, and that therefore all claims on behalf of those subclasses should be dismissed.  (Def. Inj. Mem. 20.) Additionally, defendants argue that the Attica subclass has only one named plaintiff, Anwar Abdul, and that Abdul does not raise an Eighth Amendment claim, thereby requiring the dismissal of the Attica subclass's Eighth Amendment claims.  (<u>Id</u>.)

Plaintiffs respond by pointing out that discovery has revealed that two of the named plaintiffs – Juan Perdomo and Herbert Junior – were double-celled at Clinton, and arguing that they can therefore serve as class representatives for the Clinton subclass.  (Pl. Inj. Mem. 31.) With respect to Attica, plaintiffs similarly point out that three named plaintiffs – James White, Yahya Muhammad Abdullah Muntaqim, and Michael Walsh – were double-celled at Attica, and that Abdul himself made statements in his deposition that give rise to an Eighth Amendment claim that should be read into the complaint.  (<u>Id</u>. at 31-32.)  Plaintiffs do not contend that there

_____

[6] Plaintiffs argue that defendants "threaten[]" inmates with transfer to a "facilit[y] far away from the New York City area if they do not 'volunteer' to remain in a double-cell."  (Pl. Inj. Mem. 9.)  The only support plaintiffs provide for this claim is a citation to the deposition of defendant Goord, who not surprisingly does not employ the "threat" language.  (Goord Dep. 73-75.)  Defendants admit that an inmate who does not wish to remain in a double cell after 60 days is moved to a single cell either in "his current facility *or a new facility*," thereby acknowledging that a transfer to a different facility may result if an inmate refuses to be double-celled in his current facility.  (Def. 56.1 Stmt. ¶ 58.)  Despite the difference in characterization, both parties seem to agree that prisons closer to New York City are usually more desirable for inmates, and that an inmate's refusal to be double-celled in a popular New York City-area prison may result in that inmate's transfer to a less crowded, less popular, more distant facility.

is a named plaintiff for the Great Meadow subclass, but represent that one could be added with little difficulty (Pl. Inj. Mem. 33 n.9.)[7]  More generally, plaintiffs argue that all issues regarding the appropriateness of subclass representatives were decided by this Court's opinion in <u>Jones v. Goord</u>, 190 F.R.D. 103 (S.D.N.Y. 1999), and that therefore the approval of the subclasses and their representatives is now the "law of the case."  (Pl. Inj. Mem. 32.)

Judge Pauley's opinion in <u>Jones</u> certified a "Double-Celling Class" defined as: "Every person who is or was incarcerated in the DOCS Facilities and who is or was double-celled in the Facilities by DOCS."  190 F.R.D. at 112.  After the certification of the general class, thirteen injunctive relief subclasses were certified, one for each of the thirteen facilities at issue.  <u>Id</u>. at 113.  The Court stated that the definition of the injunctive relief subclasses would be "governed by the Court's definition of the Double-Celling Class."  Therefore, for example, the Clinton subclass would be defined as: "Every person who is or was incarcerated in Clinton and who is or was double-celled in Clinton by DOCS."

Because a subclass is itself a class, each subclass must separately and independently satisfy the requirements of Rule 23 for class certification.  Fed. R. Civ. P. 23(c)(4)(B) ("a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly"); <u>see also</u> <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 378-79 (2d Cir. 1997) (stating subclasses must satisfy requirements of Rule 23(b)).  The

---

[7] While plaintiffs are correct that these various inmates were double-celled in the facilities that have no class representative, it is unclear from the inmates' depositions exactly *when* they were double-celled in the facilities, and therefore it is impossible to determine on the record currently before the Court whether, at the time the initial complaint was filed or the initial motion for class certification was made, the inmates had standing to bring claims on behalf of the class.

Court noted that "[b]ased on the allegations in the second amended complaint, each Injunctive Relief Sub-Class appears to meet the requirements of Rule 23(b)(2)." Jones, 190 F.R.D. at 113. No further inquiry was undertaken at that time with respect to Rule 23(b)(2), nor was any inquiry made as to whether the subclasses satisfied Rule 23(a)'s requirements. The Court did, however, explicitly note its power under Rule 23(c)(1)(C) to decertify a class "if later events reveal that the reasons for granting class certification no longer exist or never existed." Id. at 111.

In light of this Court's prior statements in Jones, plaintiffs' argument based on "the law of the case" is without merit. The Court did not claim to examine the adequacy of subclass representation, and even if there were an implicit approval of the adequacy or typicality of the subclass representatives, that approval is (as was expressly noted in the Court's opinion) subject to the Court's power under Rule 23(c)(1)(C) to revisit a certification decision. Irrespective of the prior opinion, this Court has the obligation to ensure that the requirements of Rule 23, including adequate representation, are met for each of the subclasses.

Turning then to the merits of defendants' objections to the Attica, Clinton, and Great Meadow subclasses, defendants are correct that the third consolidated and amended complaint, filed after the certification of the subclasses, identifies no named plaintiffs for the Great Meadow and Clinton subclasses, and names Abdul as the sole representative of the Attica subclass. (Compl. ¶ 16-24.)[8] Plaintiffs do not deny these claims, but simply seek leave to amend their

---

[8] It appears from the structure of the complaint that paragraphs 16 through 24 designate named plaintiffs for each of the subclasses. In addition to the lack of any reference to named plaintiffs for the Clinton or Great Meadow subclasses in these paragraphs, there is also no mention of the Wende facility. Defendants have not raised an objection to the Wende subclass, presumably because Wende is not one of the exemplary institutions for purposes of discovery.

complaint to include named plaintiffs for the unrepresented subclasses and claims.[9]

Fed. R. Civ. P. 15(a) states that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Our Court of Appeals has explained this provision of the Rule as follows:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

United States ex rel. Mar. Admin. v. Cont'l Ill. Nat'l Bank & Trust Co., 889 F.2d 1248, 1254 (2d Cir. 1989). Defendants assert that the plaintiffs' requested amendments would be prejudicial because "a claim that [a named plaintiff's] rights were violated at one facility does not put defendants on notice that an inmate claims his rights were violated at a different facility." (Def. Inj. Reply 58-59.) However, the prejudice claimed by defendants falls short of that which existed in the cases they cite for support. For example, in Milligan v. Citibank, N.A., the plaintiff sought to amend her complaint to bring *new claims* against the defendant after a summary judgment motion had already been fully briefed. No. 00 Civ. 2793, 2001 WL 1135943, at *9 (S.D.N.Y. Sept. 26, 2001). Here, where plaintiffs simply seek to add named plaintiffs for several subclasses, the claims themselves are not "new" in any sense of the word. Defendants surely cannot claim that before plaintiffs' request to amend the complaint they were

---

[9] Plaintiffs' argument that Abdul does in fact raise an Eighth Amendment claim is hardly worth a response. The citation to Abdul's deposition provided by plaintiffs reveals that while Abdul was "depressed a lot" from being double-celled, he was never actually injured in any way. (Abdul Dep. II 24-26.) In any event, in light of the Court's disposition of plaintiffs' request to amend the complaint, discussed below, there is no need for the Court to read claims into the complaint that are simply not made.

not on notice that the double-celling policies in Attica, Clinton, and Great Meadow were the subject of this litigation and were being challenged under the Eighth Amendment.

While defendants would not be prejudiced by allowing plaintiffs to amend the complaint, any such amendment would be futile for the reasons discussed in the remainder of this opinion. Accordingly, the claims involving Great Meadow and Clinton, and the Eighth Amendment claim involving Attica, will be dismissed, and plaintiffs will not be granted leave to amend the complaint to add representatives for each of those subclasses.

Notwithstanding the dismissal of these claims for lack of named plaintiffs, the merits of the claims must nevertheless be addressed. First, because defendants would not be prejudiced by permission to amend the complaint, the Court's refusal to permit an amendment is based on the futility of such amendment, a conclusion that can only be reached after considering whether an amended complaint could succeed on the merits. Second, discovery in this case has focused on four facilities – Attica, Clinton, Great Meadow, and Green Haven. The parties have focused discovery on these exemplary facilities not because claims with respect to the facilities are the only claims at issue on this motion, but because the parties have agreed that the exemplary facilities are just that – exemplary. Therefore, even though the claims of the Clinton subclass and the Great Meadow subclass are not now properly before the Court, the Court will consider the evidence from Clinton and Great Meadow, and evidence relating to Eighth Amendment claims from Attica, because the parties have agreed that the evidence from the four exemplary facilities in the record is representative of the evidence supporting the class's claims as a whole.

II.  Summary Judgment Standard

Summary judgment shall be granted if the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  The party moving for summary judgment bears the initial responsibility of informing the District Court of the basis for its motion and identifying those portions of the record which it believes "demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the nonmoving party bears the burden of proof on a specific issue at trial, the moving party may satisfy its initial burden by merely pointing out the absence of evidence in the record necessary to support the nonmoving party's position on that issue.  Id.  If the moving party satisfies this initial burden, the nonmoving party must then produce evidence sufficient to create a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 323; Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion." Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  In addition, the Court is not to make any credibility assessments or weigh the evidence at this stage.  Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

To determine which facts are material, the Court must look to the substantive law that supplies the basis for the claims at issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  Defendants' motion for summary judgment focuses on plaintiffs' class claims for injunctive relief under the First and Eighth Amendments and plaintiffs' individual claims for damages under the First and Eighth Amendments.  This opinion will first address plaintiffs' class claims for injunctive relief under the Eighth Amendment, then plaintiffs' claims for injunctive relief under the First Amendment, and finally plaintiffs' individual damages claims.

III.  Plaintiffs' Eighth Amendment Injunction Claims

    A.  The Legal Framework

It is indisputable that conditions of prisoners' confinement must conform to the requirements of the Eighth Amendment.  See Rhodes, 452 U.S. at 345.  The Constitution does not, however, guarantee prisoners freedom from any and all sorts of unsavory environs.  "To the extent that . . . conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  Id. at 347.  The Constitution draws a line between conditions that are harsh, and conditions that are "cruel and unusual" within the meaning of the Eighth Amendment.  Prisoners live every aspect of their lives completely under the State's control, and the State must exercise that control in accordance with society's standards of decency.  Those standards dictate that the conditions of confinement in American prisons "must not involve the wanton and unnecessary infliction of pain."  Id.

To determine whether conditions of confinement are in accord with these constitutional requirements, courts apply a two-part test.  First, under the objective prong of the inquiry, a deprivation violates the Constitution only if it is "sufficiently serious."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  "The Constitution . . . 'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently

grave to form the basis of an Eighth Amendment violation." Wilson, 501 U.S. at 298, quoting

Rhodes, 452 U.S. at 347, 349. To violate the Eighth Amendment, a challenged condition of

confinement must lead to the "specific deprivation of a single human need." Wilson, 501 U.S. at

305. Various conditions can be aggregated to state an Eighth Amendment violation, but only to

the extent that the aggregation of those conditions affects a single need, such as a lack of

blankets and a lack of heat combining to deprive an inmate of warmth. Id. at 304.

When a plaintiff claims that prison officials are violating (or have violated) the Eighth

Amendment by failing to protect him from harm, a prisoner need not wait for inhumane suffering

to occur before obtaining relief. "It would be odd to deny an injunction to inmates who plainly

proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had

happened to them." Helling v. McKiney, 509 U.S. 25, 33 (1993). Therefore, the first prong of

the test is also satisfied if there exists a "substantial risk of serious harm" to the prisoner.

Farmer, 511 U.S. at 834. If a condition of confinement is sure to cause, or very likely to cause,

needless suffering, the Constitution does not allow prison officials to ignore the offending

condition. Helling, 509 at 33.

Second, under the subjective prong of the inquiry, a constitutional violation exists only if

the defendants have a "sufficiently culpable state of mind." Id. The specific mental state

required to make out an Eighth Amendment claim differs depending on the conduct of the

defendants against which the claim is alleged. For example, a prison official who causes injury

in the course of subduing a prison disturbance violates the Eighth Amendment only if he acts

"maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S.

312, 320-21 (1986). In cases such as the instant matter, where plaintiffs allege injury resulting

from conditions of confinement, the required state of mind is "deliberate indifference" on the part of the prison officials. Wilson, 501 U.S. at 303.

The same "deliberate indifference" standard applies to claims that prison officials failed to protect plaintiffs from harm. Farmer, 511 U.S. at 834. "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." Id. at 833. However, not every prison scuffle is a matter of constitutional import, and the mere existence of the chance that a prisoner might be injured by another prisoner does not violate the Eighth Amendment. Even under the best of conditions, prisoners will sometimes be harmed by other prisoners, and the Constitution is not blind to that unfortunate reality. Under the "deliberate indifference" requirement, prison officials violate the Eighth Amendment only if they are subjectively aware of an "excessive risk to inmate health and safety" and do not respond reasonably to that risk. Id. at 834-38, 844; see also Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) ("The Eighth Amendment requires prison officials to take reasonable measure to guarantee the safety of inmates in their custody."). "In sum, prison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner." Heisler v. Kralik, 981 F. Supp. 830, 837 (S.D.N.Y. 1997).

Plaintiffs allege that four particular aspects of defendants' double-celling policy violate the Eighth Amendment: the general conditions of confinement in double cells, the risk of inmate against inmate violence, injury and disease, and secondhand smoke in double cells. Each of these alleged violations will be addressed in turn.

B. <u>Conditions of Confinement</u>

Plaintiffs claim that there are material issues of fact regarding whether the conditions of confinement in double cells amount to an Eighth Amendment violation. (Pl. Inj. Mem. 35-37.) In support of this claim, plaintiffs point to the fact that most double cells are approximately 50 square feet and the fact that these small cells are coupled with "unsanitary conditions." (<u>Id</u>. 35.) The unsanitary conditions of which plaintiffs complain are the lack of floor space (Nathan Rep. 19-20), the distance between the beds and the toilets in the cells (<u>id</u>. 20), the amount of personal property kept in cells (<u>id</u>. 19-20), the smell of "a cellmate's feces and flatulence" (<u>id</u>. 20), and the smell that can result from a cellmate's failure to bathe frequently (Pl. Inj. Mem. 36).

A reasonable finder of fact could not conclude that these conditions amounted to an Eighth Amendment violation. The Constitution does not recognize a general amorphous "conditions of confinement" claim. <u>Wilson</u>, 501 U.S. at 305. Rather, plaintiffs must show how the combined effects of the above-described conditions deprive inmates of a "single, identifiable human need such as food, warmth, or exercise." <u>Id</u>. at 304. Here, plaintiffs make no attempt, at least with respect to their general "conditions of confinement" claim, to point to any specific human need affected by the conditions of the double cells. Instead plaintiffs simply string together a list of undesirable conditions and assert in a conclusory fashion that whether "these facts are objectively serious enough to warrant an Eighth Amendment claim is an issue of fact not properly decided at the summary judgment stage." (Pl. Inj. Mem. 35.) Summary judgement is appropriate, however, if the facts alleged by plaintiffs, taken as true, fail to rise to a sufficient level of seriousness as a matter of law.

In support of their assertion, plaintiffs cite to Karacsonyi v. Radloff, 885 F. Supp. 368 (N.D.N.Y. 1995). In Karacsonyi, the district court stated that the conditions in plaintiff's cell, which measured 115 square feet and which he shared with three other inmates, could form the basis of an Eighth Amendment violation. Id. at 370-71. However, Karacsonyi involved a motion to dismiss, not a motion for summary judgment, and the district court correctly held that the conditions of the plaintiff's incarceration *could* violate the Eighth Amendment if the plaintiff were able to produce evidence that the conditions led to "deprivations of essential needs." (Id. at 371.) Plaintiffs in the instant matter have had ample opportunity to find and produce evidence that the conditions of their confinement deprived them of a human need, and reliance on mere possibility will not defeat a motion for summary judgment as it defeated the motion to dismiss in Karacsonyi.

None of the alleged conditions here deprive plaintiffs of "the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 833. On numerous occasions throughout their briefing, plaintiffs point to the fact that inmates are forced to sleep "mere inches" away from a toilet. It is unclear how this allegation relates to double-celling. Every cell, whether a single or a double, has a toilet, and given that the toilet is on the floor, an inmate in the upper bunk in a double cell is farther away from the toilet than he would otherwise be in a single cell. If the inmate on the lower bunk is 18 inches away from the toilet, and the inmate on the upper bunk is directly above the lower bunk 6 feet in the air, then by the Pythagorean theorem the inmate in the upper bunk would be approximately 63 inches away from the toilet,[10] an increase in distance of

---

[10] The Pythagorean theorem states that the sum of the squares of the sides of a right triangle equals the square of the hypotenuse. For a triangle with sides *a* and *b* and hypotenuse *c*, therefore: $a^2 + b^2 = c^2$. If a bunk bed in a double cell is 6 feet, or 72 inches, high, and the

45 inches due to the double cell's upper bunk.[11]

Similarly, plaintiffs' complaints regarding having to deal with a cellmate's odors do not rise to the level of a constitutional violation. Sharing a cell with an individual with body odor, or an individual who does not bathe frequently, is a far cry from the "wanton and unnecessary infliction of pain" against which the Eighth Amendment protects. Rhodes, 452 U.S. at 347. Furthermore, plaintiffs' claims that double-celling subjects them to "the stench of a cellmate's feces and flatulence" ignore the fact that even in a single cell, an inmate would be subjected to the "stench" of *his own* "feces and flatulence." (Nathan Rep. 20.) Plaintiffs are not so bold as to expressly claim that, to borrow a phrase, *their* "feces and flatulence" don't stink. Without question, shared quarters increase this problem, but plaintiffs offer no evidence that such conditions present a health risk, as opposed to a mere increased degree of unpleasantness.

Plaintiffs' reliance on Williams v. Adams, 935 F.2d 960 (8th Cir. 1991), in support of their argument is misplaced. The Williams Court held that the individual plaintiff had raised an issue of fact where he provided evidence that the toilet in his cell "did not work, and that it continually [ran] over [and] leak[ed] onto the cell floor and the floor stayed filthy with its

_____

horizontal distance between the lower bunk and the toilet is 18 inches, and we assume that the toilet is approximately 12 inches off the ground, then the toilet, the lower bunk, and the upper bunk define the three points of a right triangle with dimensions 18x60xD, where D is the hypotenuse and the distance along the diagonal between the upper bunk and the toilet. Using the Pythagorean theorem, $60^2 + 18^2 = D^2$, so therefore $D = \sqrt{(3600 + 324)} = \sqrt{(3924)} = 62.6$.

[11] It may reasonably be asked why an inmate would choose to sleep with his head at the end of the bed that is 18 inches away from a toilet, instead of relegating his feet to that position. Nathan reports that many inmates sleep with their heads toward the back of their cells "to avoid the real or perceived possibility of injury at the hands of other inmates during sleeping hours." (Nathan Rep. 20 n.13.) This phenomenon exists in "virtually every prison" Nathan has visited, not just those that are at issue in this litigation, and apparently has nothing to do with double-celling. (Id.)

wast[e]." Id. at 962 (internal quotation marks omitted) (alterations in original). The evidence relied upon by plaintiffs – evidence that one inmate once tried to urinate into the toilet from the top bunk but instead urinated on his cellmate, or evidence that several inmates complained that a cellmate urinated *on* the toilet instead of *in* the toilet – is not comparable to the evidence presented in Williams. Such isolated incidents of misbehavior, or simple inaccuracy, do not signify a structural lack of proper hygiene as a result of double-celling.

Finally, the fact that inmates ignore prison regulations and keep excess property in their double cells does not establish an Eighth Amendment violation. Plaintiffs fail to present any evidence that the voluntary accumulation of personal property, even when coupled with the size of the cells, has lead to the deprivation of any identifiable human need. In any event, even if plaintiffs did establish that inmates were storing so much personal property in their cells that the resulting clutter was sufficiently grave to be characterized as cruel and unusual, it is unclear how that clutter would violate the Eighth Amendment, as it would be the inmates' own desire for personal property and their refusal to use out-of-cell storage that led to the clutter, not any "punishment" imposed by defendants.

C. Violence in Double Cells

Plaintiffs claim that defendants' policy of double-celling violates the Eighth Amendment because "inmate assaults are frequent, and can lead to serious injuries." (Pl. Inj. Mem. 37.) Plaintiffs argue that defendants' double-celling policy subjects plaintiffs to a substantial risk of serious injury from an attack by a violent cellmate – a cellmate who, but for double-celling and defendants' allegedly inadequate screening, would not have had the opportunity to harm them.

As discussed above, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833. However, as the Court has explained in an earlier opinion in this case, while "no court approves of physical violence in the correctional system, the fact is that maximum security prisons house violent offenders, and confrontations between inmates are, to some extent, inevitable . . . . Such incidents, standing alone, do not necessarily rise to the level of cruel and unusual punishment." Jones, 190 F.R.D. at 108. Rather, to make out a constitutional violation, plaintiffs must provide evidence from which a finder of fact could infer that double-celling, as practiced by defendants, results in a "substantial risk of serious harm" and that defendants know of the risk and disregard it.

In support of this claim plaintiffs produce a variety of evidence. First, plaintiffs rely on specific incidents of cellmate-on-cellmate violence described by the named plaintiffs themselves. Plaintiff Aubery Thomas states that while in a double cell he was attacked and stabbed with a razor blade by his cellmate. (Thomas Dep. 172-73.) Plaintiff Gregory Rodriguez states that one cellmate burned his foot with a cigarette lighter while he was sleeping (Rodriguez Dep. 44-45), and that a different cellmate attacked him with a knife and stabbed him in the hand (id. 136). Plaintiff Luciano Ortiz states that one of his cellmates would often brandish a weapon in the cell. (Ortiz Dep. II 50-51.)

With respect to instances of violence on a more general scale, defendants have produced UI reports for inmate assaults in the general population for each of the four exemplary facilities from 1990 to 2001. For Attica, the data regarding UI reports of assaults on inmates per thousand inmates over the relevant period are as follows:

| | | | |
|---|---|---|---|
| 1990 – 10.9 | 1993 – 36 | 1996 – 49.2 | 1999 – 32.3 |
| 1991 – 35.2 | 1994 – 46.8 | 1997 – 75.2 | 2000 – 28.7 |
| 1992 – 30.7 | 1995 – 54.3 | 1998 – 52.8 | 2001 – 28.7 |

(Def. R. 56.1 Stmt. ¶¶ 97-108.)  From 1995, when double-celling began, to 2001, there were

three UIs for inmate assaults on inmates inside double cells, and one UI for sexual misconduct

inside a double cell.[12]  (Id. ¶ 110.)  Attica has 107 double cells.  (Id. ¶ 79.)

For Clinton, the data regarding UI reports of assaults on inmates per thousand inmates

are as follows:

| | | | |
|---|---|---|---|
| 1990 – 41.3 | 1993 – 51.9 | 1996 – 54.7 | 1999 – 39.3 |
| 1991 – 47.5 | 1994 – 64.3 | 1997 – 55.9 | 2000 – 32.1 |
| 1992 – 49.6 | 1995 – 70.1 | 1998 – 42 | 2001 – 30.1 |

(Id. ¶¶ 130-141.)  From 1995 to 2001, defendants report that there was only one UI for an inmate

assault on an inmate inside a double cell, and one UI for sexual misconduct inside a double cell.

(Id. ¶ 143.)  Plaintiffs, based on their own review of the UI reports, claim that there were six UIs

in double cells over that period, although based on plaintiffs' own descriptions two of those six

incidents did not take place in double cells.  Reading the record in the light most favorable to

plaintiffs, a finder of fact could conclude that there were four UIs in double cells in Clinton from

---

[12] Plaintiffs' chart of UIs lists five UIs in double cells in Attica from 1995 to 2001.  (See Zilberberg Decl. Unusual Incident Reports.)  However, plaintiffs' own description of one of the incidents describes it as taking place "in keeplock shower."  (Id.)  Accordingly, only four of the five incidents plaintiffs claim to have occurred in a double cell in Attica actually occurred in a double cell.

1995 to 2001.[13]   Clinton has 32 double cells.  (Id. ¶ 116.)

For Great Meadow, the data regarding UI reports of assaults on inmates per thousand inmates are as follows:

| | | | |
|---|---|---|---|
| 1990 – 28.8 | 1993 – 41.6 | 1996 – 69.3 | 1999 – 36.4 |
| 1991 – 23.6 | 1994 – 65.6 | 1997 – 84.5 | 2000 – 29 |
| 1992 – 48.9 | 1995 – 79.7 | 1998 – 59 | 2001 – 20 |

(Id. ¶¶ 164-175.)  From 1995 to 2001, defendants report that there were four UIs for inmate assaults on inmates inside double cells, and one UI for sexual misconduct inside a double cell.  (Id. ¶ 177.)  Plaintiffs, based on their own review of the UI reports, claim that there were seven UIs in double cells over that period.  However, based on plaintiffs' own description, one of those seven incidents did not take place in a double cell.[14]  Reading the record in the light most favorable to plaintiffs, a finder of fact could conclude that there were six UIs in double cells in Great Meadow from 1995 to 2001.  Great Meadow has 81 double cells.  (Id. ¶ 149.)

For Green Haven, the data regarding UI reports of assaults on inmates per thousand inmates are as follows:[15]

_____

[13] Plaintiffs' chart of UIs lists six assaults in Clinton, but plaintiffs describe one of those incidents as taking place in a TV room, and another incident as involving 25 inmates, which, based on plaintiffs' claims about the size of the double cells at issue here, could not have taken place inside a double cell.  (See Zilberberg Decl. Unusual Incident Reports.)

[14] Plaintiffs' chart of UIs describes one of the Great Meadow incidents as taking place "in the corridor."  (See Zilberberg Decl. Unusual Incident Reports.)

[15] Interestingly, while plaintiffs assert a general Eighth Amendment claim, apart from their double-celling claim, only with respect to Green Haven, the reported incidents of inmate violence against inmates are lower at Green Haven than at any of the other facilities for which data were provided.

| | | | |
|---|---|---|---|
| 1990 – 8.6 | 1993 – 14.5 | 1996 – 33.7 | 1999 – 26.2 |
| 1991 – 17.2 | 1994 – 17.9 | 1997 – 22.9 | 2000 – 12.9 |
| 1992 – 12 | 1995 – 23 | 1998 – 21.4 | 2001 – 8.5 |

(Id. ¶¶ 196-207.)  From 1995 to 2001, defendants report that there were two UIs for inmate assaults on inmates inside double cells, and one UI for sexual misconduct inside a double cell. (Id. ¶ 209.)  Plaintiffs claim that there were five UIs in double cells over that period, although plaintiffs' own description indicates that one of the incidents did not occur in a double cell.[16] Accordingly, a finder of fact could conclude that four UIs occurred in double cells in Green Haven from 1995 to 2001.  Green Haven has 102 double cells.  (Id. ¶ 183.)

The above data regarding reported UIs of assaults show that in each of the four exemplary facilities, the rate of UIs was lower in 2001 (after six years of double-celling) than it was in the year before double-celling began.  In other words, six years after the implementation of the DOCS double-celling policy, inmates generally face a lower risk of assault than they did before the policy was implemented, at least according to the reported UIs.  In Rhodes, the Supreme Court held that the double-celling policy there at issue did not violate the Eighth Amendment even though violence in the prison increased "in proportion to the increase in population."  452 U.S. at 343.  In the instant case, the evidence of reported UIs shows that if instances of violence have increased at all, they have increased at a rate much lower than the increase in population since the implementation of double-celling in DOCS facilities.  If an increase in violence that is proportionate to an increase in population does not violate the Eighth

---

[16]  Plaintiffs' chart of UIs describes one of the Green Haven incidents as taking place "in the yard."  (See Zilberberg Decl. Unusual Incident Reports.)

Amendment, then a *decrease* in the rate of violence is certainly insufficient to support a finding that the Eighth Amendment has been violated.

However, plaintiffs do not argue that double-celling has led to an unconstitutional increase in risk of assault for the general population. In other words, they do not claim that the most recent rates of reported assaults – 28.7 for Attica, 30.1 for Clinton, 20 for Great Meadow, and 8.5 for Green Haven – evince a violation of the Eighth Amendment that can be traced to double-celling. Indeed, such an argument would be difficult to advance given that the general risk of reported assault has decreased since DOCS implemented double-celling. Rather, plaintiffs argue that the increased risk of harm faced by inmates in double cells, as compared to the risk of harm faced by those in single cells, is violative of the Constitution. However, despite this being the basis of their claim, plaintiffs fail to actually undertake this comparison.

The aggregate data provided by defendants regarding reported UIs do not allow for a comparison of the risk of assault faced by inmates housed in single cells and those housed in double cells. Instead, the record contains the *rates* of reported UIs for the prison populations generally (including, presumably, those occurring in double cells) and the *raw number* of reported individual instances of assaults in double cells. These data thus do not permit a determination of whether inmates in *double* cells were involved in reported assault incidents at a higher rate than inmates in *single* cells.

In any event, even without the aid of a precise mathematical comparison, a finder of fact could not conclude, based on the reported UIs for assaults, that the increased risk of assault faced by inmates in double cells amounts to an Eighth Amendment violation. As a matter of logic, it certainly must be true that inmates placed in a double cell are subjected to a higher risk of assault

than inmates placed in a single cell.  That is because, all else being equal, an inmate in a double

cell has at least some risk of being assaulted by his cellmate, while an inmate in a single cell is

subjected to no such risk.  Thus, for whatever period of time inmates spend in their cells, a

double-celled inmate bears the risk of assault from a cellmate, while a single-celled inmate is

spared this risk.[17]  However, this unavoidable increase in risk cannot in and of itself violate the

Constitution; otherwise double-celling would be unconstitutional per se, or would be

constitutional only if cellmates never assaulted each other.  That is not the law.  See Rhodes, 452

U.S. at 352 (holding that double-celling is not unconstitutional despite evidence of the existence

of violence).

The evidence of reported assaults in the record is insufficient to support a finding that the

risk of violence in double cells in DOCS facilities is higher than the acceptable baseline risk that

necessarily accompanies double-celling in any prison.  Taken in the light most favorable to

plaintiffs, there were four reported assaults in double cells in Attica, four in Clinton, six in Great

Meadow, and four in Green Haven, all over a span of seven years.  These eighteen instances in

seven years across four institutions containing a total of 322 double cells are simply too few to

support a finding that plaintiffs face an unconstitutional risk of assault, especially when

considered in connection with the fact that overall violence in these institutions has decreased

over that time.  See Bolton, 992 F. Supp. at 627 (noting that de minimis instances of violence in

double cells were insufficient to establish a substantial risk of serious harm); cf. Jensen v.

Clarke, 94 F.3d 1191, 1198 (8th Cir. 1996) (affirming district court's conclusion that double-

---

[17] But see supra note 11 (noting that inmates in both single and double cells fear that
inmates outside their cells will assault them while they are in their cells).

celling created a substantial risk of harm based on an overall increase in violence and evidence that violence "carried over" into double cells).[18]

Plaintiffs do not dispute the conclusion that eighteen reported assaults over seven years are insufficient to support the a finding that the DOCS double-celling policy creates an unconstitutional risk of serious harm. Rather, plaintiffs argue that reported UIs do not reflect all of the actual instances of inmate-on-inmate assaults that occur in double cells, and that "much violence – especially sexual violence – occurs in prison that does not get reported to staff." (Pl. Inj. Mem. 22.) That is no doubt true as a general matter. The fact that some prison violence is not reported to prison authorities cannot be seriously debated.[19] Plaintiffs provide a variety of academic literature and penological studies showing that inmates are never excused for betraying another inmate by reporting misbehavior (Zilberberg Decl. Ex. G), that 22% of men surveyed in a Midwestern prison responded that they had been sexually assaulted in prison, but only 29% of them reported the incident to prison authorities (id. Ex. H), and that sexual assault and rape in prison are often not reported (id Ex. I).

While none of the studies cited by plaintiffs dealt specifically with the New York prisons here at issue,[20] plaintiffs' expert Nathan does provide some evidence of under-reporting in the

_____

[18] Indeed, the number of reported incidents in double cells is so low that a factfinder could infer from these statistics that defendants' screening and selection procedures for double-celling are effective in reducing the risk of violence.

[19] The same is true of crimes occurring in the general population. Criminologists have long speculated about the "dark figure" of crime – crime that goes unreported to the police. See, e.g., Marvin E. Wolfgang, Uniform Crime Reports: A Critical Appraisal, 111 U. Pa. L. Rev. 708 (1963).

[20] Nathan refers to a report titled "Problems Between Bunkies" that relates to Attica. (Nathan Rep. 25.) However, the report itself is not a part of the record, and Nathan's assertion

prisons he visited. During his tour of the four exemplary facilities, Nathan interviewed a number of inmates, and through those interviews Nathan learned of incidents of violence that occurred in double cells but were not reported as UIs.[21] (See Nathan Rep. 30-31.) Nathan describes an incident at Clinton in which an inmate was raped by his cellmate, two separate incidents at Green Haven in which fights resulted from unwanted sexual advances, and an incident at Attica in which one inmate had repeated fights with his cellmate. Nathan asserts that each of these incidents was reported, but that none resulted in a UI report. (Id. 25-27.) Aside from these instances, Nathan's report does not detail the seriousness of the unreported fights revealed during his interviews, nor does Nathan define what he means when he uses the word "fight" to describe an altercation. At one point in his report, Nathan defines "intra-cell violence" to include "threats of violence, use of force with no injury or with minor injuries, cell extraction with no injury or minor injuries, and two inmates fighting each other with no injury or minor injuries." (Id. 24-25.) Such instances of "violence" fall short of what the Constitution considers cruel and unusual. Nevertheless, Nathan's report supports the conclusion that there have been a number of incidents at the exemplary facilities – incidents of varying degrees of seriousness – that are not reflected in the UI reports.[22]

---

that the report documents seventeen incidents of "fighting" from 1996 to 2000 provides no information regarding the seriousness of the fights.

[21] Defendants argue that the incidents of violence Nathan discusses in his report are hearsay, and therefore should not be considered on this motion for summary judgment. The Court, however, is not considering the evidence from Nathan's interviews for the purpose of determining whether a finder of fact could infer that any particular incident took place, but rather the Court is considering the evidence as support for Nathan's conclusion, as an expert, that incidents of violence are under-reported in DOCS prisons.

[22] This conclusion is not surprising given that UI reports only reflect serious infractions.

Defendants admit that "some violence is unreported in prisons in general." (Def. Inj. Reply 25.) However, defendants argue that when considered together with the undisputed UI data, which shows a decrease in overall violence, the mere fact that some violence goes unreported is insufficient to raise an issue of material fact with respect to plaintiffs' claim that double-celling as practiced by DOCS exposes inmates to a substantial risk of serious harm and that defendants were deliberately indifferent to that risk. The Court agrees.

Based on Nathan's report, the academic literature provided by plaintiffs, and the testimony of defendants' own officials, a finder of fact could certainly conclude that much violence in the New York prison system goes unreported. However, plaintiffs make no attempt to provide an estimate on the rate of under-reporting in New York prisons. If the reported rates of violence, standing alone, fall short of a constitutional violation (as plaintiffs apparently concede they do) then, on the record before the Court, a finder of fact would be required to simply pick a multiplier out of the air, or perhaps out of the literature that relates to other prisons in other jurisdictions, and speculate as to the actual level of violence in New York prisons. Nathan's report provides evidence of the under-reporting of violence in DOCS facilities; based on his review of the UI reports and his interviews he concludes that "all forms of intra-cell violence do not result in the preparation of a [UI report]." (Nathan Rep. 24.) However, nowhere in the report does Nathan offer a conclusion regarding the actual *rate* of under-reporting in the prisons he visited.[23] A finder of fact could conclude that the information regarding

---

[23] Nathan advances two distinct arguments. On one hand, he asserts that prison violence is often not reported to prison authorities. On the other hand, he asserts that in DOCS facilities, even when incidents *are* reported to prison authorities, they are not always reflected in UI reports.

reported assaults provided by defendants understates the actual risk of assault to plaintiffs, but plaintiffs have provided no evidence from which a finder of fact could infer what the *actual* risk of assault is, and whether that actual risk is higher than that which is tolerated by the Constitution.

Plaintiffs specifically challenge defendants' policy of *double-celling* inmates, and argue that the policy leads to an unconstitutional increase in the risk of assault. Therefore, to evaluate plaintiffs' claims a factfinder must compare the rate of assault for single-celled inmates to the rate of assault for double-celled inmates, and determine if defendants' double-celling practices and procedures result in an unconstitutional increase in the risk of serious harm to double-celled inmates. However, plaintiffs do not present any evidence regarding the level of under-reporting in double cells as compared to the level of under-reporting generally. Without the ability to differentiate between under-reporting in the two settings, a finder of fact is unable to adjust separately the reported risk of assault in double cells and the reported risk in the general prison population.

Even if a finder of fact were to rely on the under-reporting rates from the studies provided by plaintiffs – studies that are admittedly based on prisons not the subject of this litigation – those studies involve the under-reporting of prison assaults generally, not under-reporting in double cells specifically. On the other hand, Nathan's interviews provide some evidence of under-reporting in the double cells in the prisons he visited, but that under-reporting is not compared to under-reporting in the general population in those prisons.

Plaintiffs do not argue that the handful of reported UIs in double cells from 1995 and 2001 are sufficient by themselves to establish that inmates in double cells are subjected to a risk

of harm that is unconstitutionally higher than that which is faced by inmates in single cells. Rather, plaintiffs argue that under-reporting of violence is masking evidence of a constitutional violation. However, even if a factfinder were able to determine an under-reporting factor for DOCS facilities, there is no evidence in the record that would support application of that factor only to the risk in double cells. To show that under-reporting affects data regarding the *increased risk* caused by double-celling, plaintiffs would have to show not only that under-reporting exists, but that it affects the reporting of incidents in double cells more than the reporting of incidents generally.

On this point plaintiffs offer only Nathan's opinion that, because double cells are more isolated than common areas, guards are less likely to notice incidents in double cells and therefore those incidents are less likely to be reported than those occurring in common areas. (Nathan Rep. 27.) A factfinder could certainly accept Nathan's conclusion as a general matter, but once again, if the factfinder wanted to adjust the reported risks of assault by applying separate under-reporting factors, the decision of how much higher to set the under-reporting factor for double-cell incidents would be left to pure speculation and guesswork. Nathan hypothesizes that under-reporting is more prevalent in double cells, but plaintiffs offer no evidence regarding *how* much more prevalent. Therefore, there is no evidence from which a factfinder could infer the actual difference between the risk of violence in single cells and double cells, or whether that difference violates the Eighth Amendment.

In the end, plaintiffs' arguments boil down to a claim that, while the evidence of reported assaults in the record does not establish a constitutional violation, a finder of fact could infer that some assaults are unreported, and could further infer that under-reporting occurs more often in

32

double cells than in the general population.  Therefore, under plaintiffs' theory, a factfinder

would have to decide whether that defendants' double-celling policy results an in

unconstitutional risk of harm without having any idea of what the risk of harm actually is.

Plaintiffs essentially call for the finder of fact to speculate about the possible effects of double-

celling, based on studies from other prisons and a small number of interviews conducted by the

plaintiffs' expert.  However, as Justice Brennan has explained, "[plaintiffs] may well be correct

*in the abstract* that prison overcrowding and double celling . . . generally results in serious harm

to the inmates.  But cases are not decided in the abstract.  A court is under the obligation to

examine the *actual effect* of challenged conditions upon the well-being of the prisoners."

Rhodes, 452 U.S. at 367 (Brennan, J., concurring).  Despite years of discovery, plaintiffs provide

no evidence regarding what the risk of assault in a double cell *actually is*.  Instead, plaintiffs

simply claim that it is higher than what defendants report.  Because plaintiffs present no

evidence and make no claims regarding what the actual risk of assault is in a double cell,

plaintiffs are unable to make any argument that the actual risk is "substantial" enough to make

out a constitutional violation.  Instead, plaintiffs simply assert that, when forced to speculate

about the actual risk of harm, a finder of fact could pick a number that happens to be above the

constitutional threshold, whatever that may be.

Finally, it bears repeating that the crux of plaintiffs' argument is that while double-celling

is not per se unconstitutional, despite the increased risk of assault intrinsic to the practice,

double-celling *as practiced in New York* is unconstitutional, because the program in New York is

administered in a constitutionally inadequate manner, in reckless disregard of inmate safety.

Absolutely nothing in plaintiffs' speculations about unreported intra-cell violence supports this

conclusion, since plaintiffs offer no evidence that the rate of such violence is unacceptably high, or exceeds what would occur with optimal screening and selection procedures.

In Rhodes, the Supreme Court rejected a similar Eighth Amendment claim because, while "the court found that the number of acts of violence had increased . . . [, r]espondents failed to produce evidence establishing that double celling itself caused greater violence." Id. at 342-43. Here, plaintiffs have not even shown a general increase in violence since DOCS began double-celling inmates in 1995, much less that double-celling itself *caused* an increase in violence. For the reasons discussed above, plaintiffs have failed to raise an issue of fact regarding whether double-celling, as practiced by DOCS, creates a substantial risk of serious harm to inmates due to violence.

    D.  Injury and Disease in Double Cells

Plaintiffs next argue that the conditions of confinement in double cells at DOCS facilities have led to injury and disease. Specifically, plaintiffs allege that getting in and out of the top bunk in double cells has caused various injuries (Pl. Inj. Mem. 43) and that inmates have contracted various infectious diseases – such as tuberculosis, a cold, the flu, a rash, HIV, and hepatitis – from their cellmates (id. 43-44).

Plaintiffs' claims regarding disease and injury are evaluated under same constitutional requirements as those that applied to their claims regarding inmate violence. Plaintiffs must produce sufficient evidence for a finder of fact to conclude that double-celling created an unreasonable risk of serious damage to inmates' health, Helling, 509 U.S. at 35, and that defendants deliberately disregarded that risk, id. at 36.

Plaintiffs' Eighth Amendment claim in connection with bumps and bruises received getting into and out of the top bunk in a double cell is completely without merit. In support of this claim plaintiffs cite to the depositions of nine inmates describing various injuries they received while entering or exiting their beds. (Pl. Inj. Mem. 43.) Regardless of whether these particular injuries could be qualified as serious, plaintiffs present no evidence from which a finder of fact could conclude that inmates *generally* are subjected to a substantial risk of serious harm from getting in and out of bed. Apart from simply describing the bunk beds as six feet high, plaintiffs produce no evidence regarding the general safety of the beds, and plaintiffs do not argue that the design or placement of the beds is unsafe. Instead, plaintiffs seem to argue that, because nine inmates have injured themselves getting in or out of bed, a factfinder could conclude that six-foot bunk beds are per se unconstitutional.[24] However, no reasonable factfinder could reach such a conclusion.

Plaintiffs' claims regarding the spread of disease in double cells fare slightly better than their bunk bed claims, but ultimately they too lack sufficient evidentiary support to survive summary judgment. First, plaintiffs claim that six inmates caught colds from their cellmates. Catching the common cold from another inmate is not a serious injury or an inhumane condition that violates the Eighth Amendment. Furthermore, plaintiffs' claims regarding colds suffer the same infirmity as plaintiffs' claims regarding bunk beds – apart from six specific incidents, plaintiffs present no evidence that double-celled inmates generally, as a class, were subjected to a substantial risk of catching colds due to double-celling.

---

[24] Indeed, the argument would apply not merely to double cells, but to any elevated bed, even in a single cell.

The other diseases about which plaintiffs complain – tuberculosis, HIV, and hepatitis – cannot be dismissed as trivial. There can be little doubt that each of these diseases, if contracted by an inmate, would result in serious harm. Defendants do not argue otherwise. Plaintiffs, however, have presented insufficient evidence for a finder of fact to conclude that inmates are at a substantial risk of contracting any of these serious diseases from their cellmates inside a double cell.

Plaintiffs admit that since double-celling was implemented in 1995, the number of AIDS cases in DOCS facilities has declined by 18% (Def. R. 56.1 Stmt. ¶ 73), and that since 1991, when DOCS began a tuberculosis control program, the number of tuberculosis cases have declined each year, from 83 in 1995 to 17 in 2001, despite an increase in the overall prison population during that period (id. ¶ 74). Similarly, the rate of newly positive tests for tuberculosis has fallen from 2.4% in 1993 to 1% in 2002. (Id. ¶ 76.)

To support their claims, plaintiffs have not produced any evidence of HIV or hepatis being spread from one cellmate to another in a double cell. Instead, plaintiffs argue that there is "circumstantial evidence" regarding the *potential* for these diseases to spread because there are some inmates who have these diseases in double cells, these diseases spread via blood or sexual contact, and violence (which draws blood) and sexual activity can occur in a double cell. (Pl. Inj. Mem. 44.) Plaintiffs offer no evidence that any inmate has *ever* contracted either HIV or hepatitis in a double cell. However, the record does show that DOCS provides education and counseling regarding the spread of HIV to inmates at the four exemplary facilities. (Mulligan Aff. ¶¶ 2-10.) Perhaps for this reason, the potential for the spread of these diseases in double cells has not resulted in any evidence of these diseases *actually* spreading in double cells since

the practice began in 1995.[25] Absent such evidence, plaintiffs have failed to raise an issue of fact regarding whether double-celling creates a substantial risk of contracting these diseases.

With respect to tuberculosis, plaintiffs offer evidence of two inmates who claim that they were exposed to tuberculosis in a double cell. Plaintiff Barnett claims that he was diagnosed with tuberculosis after being removed from a double cell. (Barnett Dep. 19.) However, plaintiffs present no evidence from which a finder of fact could conclude that Barnett contracted tuberculosis from his cellmate, as opposed to one of the countless other inmates with whom he interacted on a daily basis in programs or in the yard (Def. R. 56.1 Stmt. ¶ 4). None of Barnett's cellmates were ever diagnosed with active tuberculosis, and Barnett himself has not developed active tuberculosis since his positive test. (Id. ¶¶ 7,8.)[26]

Plaintiff Hunt alleges that his cellmate in Green Haven had tuberculosis. This allegation is based on the hearsay statement of another inmate who told Hunt that the cellmate had tuberculosis, and Hunt's own medical diagnosis that his cellmate's coughing "wasn't coming from the chest" but was coming from "deep in and . . . from [the] kidney, around there." (Hunt

---

[25] In contrast to their claims regarding increased violence, plaintiffs do not argue that incidents of disease transmission in double cells are under-reported due to a fear of retaliation for "ratting" on a fellow prisoner. Plaintiffs offer no explanation for the lack of evidence of disease transmission, and instead rely on the apparently as-yet unrealized "potential" for such an occurrence.

[26] In response to defendants' assertion and accompanying citation to the record that none of Barnett's cellmates had active tuberculosis, plaintiffs claim that they do "not have sufficient information to admit or dispute" defendants' statements. (Pl. R. 56.1 Stmt. ¶¶ 5-8.) The Rule 56.1 Statement is not an answer, and defendants' motion for summary judgment is not a motion to dismiss. Plaintiffs' allegations are not assumed to be true, and those allegations must be supported by evidence in the record. If, after years of discovery, plaintiffs do not have "sufficient information" to dispute evidence provided by defendant, or to argue that defendants' evidence is not reliable, then those facts asserted by defendants are deemed admitted. See Local R. 56.1(c).

Dep. 129.)  Plaintiffs present no evidence regarding who this cellmate was, or whether he in fact ever tested positive for tuberculosis.

The evidence in connection with these two inmates is insufficient to raise an issue of fact regarding whether the inmates were exposed to active tuberculosis inside their double cells. Barnett's bare assertion that he contracted tuberculosis from a cellmate is insufficient to defeat a motion for summary judgment when the evidence in the record shows that none of his cellmates had active tuberculosis.  Similarly, Hunt's opinion that his cellmate's cough was coming from his kidney, instead of from his chest, is insufficient to support a finding that his cellmate had active tuberculosis, given that Hunt has no medical training or experience, and plaintiffs offer no explanation for how a cough could originate in a kidney, or, if it could, why such a cough would be a sign of tuberculosis.

Plaintiffs have failed to produce evidence from which a finder of fact could conclude that any inmate with active tuberculosis was ever housed in a double cell.  Without such evidence, plaintiffs have failed to raise an issue of fact regarding whether inmates faced a substantial risk of contracting tuberculosis from a cellmate.  See Bolton, 992 F. Supp. at 628 (finding no substantial risk of harm when trial produced no evidence of inmates with active infection housed in double cells).

In their Rule 56.1 Statement, defendants assert that "[N]o inmate has contracted a serious disease, including but not limited to active [tuberculosis], HIV or Hepatitis B or C, from his cellmate at [the four exemplary institutions.]" (Def. R. 56.1 Stmt. ¶¶ 111, 144, 178, 210.)  In response to this assertion, plaintiffs state that given the conditions of the cells, and the screening practices of DOCS, there is a "high likelihood that inmates have contracted serious diseases from

38

their cell-mates." (Pl. R. 56.1 Stmt. ¶¶ 111, 144, 178, 210.) However, with the exception of the tuberculosis cases discussed above, plaintiffs have not produced any evidence of any inmate actually contracting, or even being exposed to, a serious disease from his cellmate in a double cell. Plaintiffs' reliance on potential and likelihood, after years of discovery have failed to produce even one inmate who has contracted a serious disease from a cellmate, is insufficient to create an issue of fact regarding the spread of disease in double cells.

    D. <u>Screening Procedures</u>

At various points in their briefing, plaintiffs take issue with the screening procedures defendants employ before placing an inmate in a double cell. As discussed above, plaintiffs do not challenge defendants' assertions regarding the screening procedures to the extent those assertions state DOCS policy. However, plaintiffs do dispute whether the policy is actually carried out in practice. According to plaintiffs, "the screening procedures promulgated by DOCS were flagrantly ignored by prison officials." (Pl. Inj. Mem. 40.)

In support of this claim, plaintiffs point to Nathan's review of 250 screening forms, and his conclusion that in "a great many instances" the officials departed from the stated procedures and guidelines. (Nathan Rep. 37.) In a number of instances, Nathan reports that the "override" line on the form – which is supposed to be used to explain why an inmate who otherwise would not be placed in a double cell is in fact placed in a double cell – indicates facts that would usually further disqualify an inmate from double-celling, such as "murder," "sex abuse 1°," or "rape/sodomy." (<u>Id</u>. 37.)

Defendants, for their part, dispute that these forms are evidence of "mistakes" in the screening process, and argue that "there can be many reasons why, after reviewing specific facts

and circumstances, an experienced corrections professional could conclude that an inmate may safely be double-celled, despite violent crimes or prison disciplinary infractions in their [sic] background." (Def. Inj. Reply 31.) Despite defendants' protestations, a finder of fact would not have to agree with defendants' assessments of the dangerousness of individual inmates, and could conclude that specific inmates presented a serious risk of harm if placed in a double cell, or that the official screening policies were otherwise ignored or misapplied.

However, plaintiffs do not challenge individual screening decisions in this litigation. Rather, plaintiffs challenge the policy and practice of double-celling as implemented by DOCS. In support of that claim, plaintiffs rely on the alleged screening failures in two ways. First, plaintiffs argue that the DOCS screening practices provide evidence that inmates were subjected to a substantial risk of serious harm, because dangerous inmates who, under DOCS's own policy, should not have been placed in a double cell were in fact placed in one. Second, plaintiffs argue that DOCS's failure to follow screening procedures establishes that defendants were deliberately indifferent to the risk of harm faced by inmates.

With respect to plaintiffs' first argument, the evidence of screening mistakes is insufficient to create an issue of fact in light of the evidence in the record regarding the actual risk of harm faced by inmates. It is too late in the day for plaintiffs' reliance on screening procedures to bear the burden they ask of it. If it were 1995 instead of 2006, and the record before the Court did not contain evidence of the actual results of double-celling, then evidence that the double-celling procedures would place dangerous inmates together with victim-prone inmates might allow a factfinder to conclude that those placements would result in a substantial risk of serious harm. In 1995, actual double-celling had not yet begun, and so a finder of fact

would necessarily have to rely on hypothetical projections based only on knowledge of the screening processes. Evidence that a substantial risk resulted from poor screening might well have warranted concern that harm to inmates could occur.

It is not 1995, however, and extensive discovery thas been undertaken in connection with this litigation. Thus, the record contains substantial evidence of the *actual* results of double-celling. The relevant issue, after eleven years of double-celling, is not whether certain inmates were sorted properly or whether they should or should not have been double-celled. Rather, the issue is, regardless of who ended up in which cell, whether defendants' actions resulted in a substantial risk of serious harm to plaintiffs. While projecting the possible effects of certain procedures could create an issue of fact if the record were an otherwise blank slate, such projections are of little utility when considered together with a full factual record. Given the evidence before the Court, there is no need for a factfinder to examine the procedures employed by DOCS and hypothesize whether or to what extent those procedures create a risk of harm; the record contains evidence regarding the actual risk that results from defendants' procedures, and as discussed above, plaintiffs have failed to produce sufficient evidence for a finder of fact to conclude that the risk is substantial.

With respect to plaintiffs' second argument, it is unnecessary to consider whether DOCS procedures, either as written or as practiced, demonstrates defendants' indifference to a substantial risk of serious harm, because the record does not support a conclusion that such harm existed. To satisfy the Constitution's deliberate indifference requirement, plaintiffs would be required present evidence from which a finder of fact could conclude that defendants knew of and disregarded a substantial risk, meaning that defendants "must both [have been] aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also [have] draw[n] the inference." <u>Farmer</u>, 511 U.S. 837.

Defendants argue that to the extent that plaintiffs' evidence regarding the actual risk of harm is based on unreported violence, the deliberate indifference requirement cannot be met because "officials cannot consciously disregard a risk of which they are unaware." (Def. Inj. Reply 20.) Plaintiffs counter by relying on defendants' alleged disregard of double-celling procedures, and argue that defendants' failure to follow their own procedures, which were designed to ensure the safety of inmates, shows defendants' deliberate indifference. On the record before the Court, a finder of fact could conclude that defendants were aware of whatever risk of harm is supported by the evidence. Defendants knew about the reported violence and they knew about general theories relating to under-reporting of prison violence. However, in light of plaintiffs' failure to create an issue of fact with respect to the substantial risk prong of the inquiry, the Court need not address this issue further.

E. <u>Secondhand Smoke in Double Cells</u>

Finally, plaintiffs argue that inmates in double cells are exposed to excessive levels of secondhand smoke that causes "immediate health problems as well as excessive risks of future harm" in violation of the Eighth Amendment. (Pl. Inj. Mem. 41.) Exposure to secondhand smoke can give rise to an Eighth Amendment violation. <u>Helling v. McKinney</u>, 509 U.S. 25 (1993). As with all claims relating to conditions of confinement, an Eighth Amendment claim based on exposure to secondhand smoke must show that the exposure created an "unreasonable risk of serious damage" to inmates' future health, and that prison officials were deliberately indifferent to that risk. <u>Id</u>. at 35. To satisfy the objective requirement, plaintiffs must show that

inmates are exposed to "unreasonably high levels" of secondhand smoke.  <u>Warren v. Keane</u>, 196

F.3d 330, 333 (2d Cir. 1999), <u>quoting</u> <u>Helling</u>, 509 U.S. at 35.

In support of their secondhand smoke claim, plaintiffs rely on the deposition testimony of

several inmates who claim that secondhand smoke from their cellmates resulted in various

harms.  Plaintiff Bailey claims that his pre-existing asthma was aggravated by his cellmate's

smoking.  (Bailey Dep. 58-59.)  Plaintiff Barnett asserts that he was double-celled with several

smokers and that the secondhand smoke "choke[d]" him, made it "hard for [him] to get to sleep,"

and caused him to "feel like [he] can't breathe."  (Barnett Dep. 39.)  Plaintiff Bermudez states

that "inhalation of smoking"caused him to "suffer" in his double cell (Bermudez I Dep. 26) and

that many of his cellmates smoked and refused to blow their smoke outside of the cell when

asked (Bermudez II Dep. 29-32). Plaintiff Hunt claims that two of his cellmates smoked and that

as a result he experienced excess phlegm.  (Def. R. 56.1 Stmt. Hunt ¶ 7.)  Plaintiff Martin states

that all of his cellmates smoked.  (Def. R. 56.1 Stmt. Martin ¶ 19.)  Plaintiff Juan Rivera asserts

that he was exposed to secondhand smoke during his incarceration, although the record is not

clear how much of this smoke was produced by Rivera's cellmates.  (J. Rivera Dep. 85-89.)

Plaintiff West claims that all of his cellmates were smokers, that they were "constantly smoking

. . . with no ventilation," and that "there was just smoke and it was constantly – it just totally

irritate[d]" him and made it "hard to breathe."  (West Dep. 86.)[27]

---

[27] Plaintiffs also cite to plaintiff White's deposition, but the portion of the deposition on which they rely relates to ventilation in double cells and "germs."  (White Dep. 64.)  Later in his deposition, in a portion not cited by plaintiffs, White states that he did not suffer any physical harm as a result of double-celling.  (<u>Id</u>. 96.)

In addition to the testimony of the aforementioned inmates, plaintiffs' expert Nathan reports that during his tour of the four exemplary facilities he "observed full ashtrays in a number of cells" and spoke to "many inmates" who "complained about sharing a cell with a smoker or acknowledged that their own smoking bothered their cellmate."  (Nathan Rep. 21.)

Defendants argue in their initial papers that plaintiffs' claim for injunctive relief, insofar as it is based on secondhand smoke, is moot, because since January 2001 smoking has been prohibited in all DOCS facilities.  (Def. Inj. Mem. 88; Def. R. 56.1 Stmt. ¶ 54.)[28]  However, the mere existence of a policy proscribing smoking in prisons does not deprive this Court of jurisdiction to hear plaintiffs' claims if plaintiffs allege, as they do here (Pl. Inj. Mem. 42), that the policy is routinely ignored.  Davis v. New York, 316 F.3d 93, 99 (2d Cir. 2002).

To support their claim that defendants' smoking policy is not enforced, plaintiffs rely on Nathan's observations during his tour of the facilities (Nathan Rep. 21), Nathan's interviews with inmates who reported that smoking still occurs inside cells (id.), and the testimony of George Duncan, the superintendent of Great Meadow, that he believes some smoking inside cells still occurs after the implementation of the smoking policy (Duncan Dep. 105-106).[29]

---

[28] This is the only argument in opposition to plaintiffs' secondhand smoke claims presented by defendants in their initial papers, and it fills less than a single page in a 114-page submission.  (Def. Inj. Mem. 88.)

[29] Plaintiffs also cite to the deposition of Gerald Gaes in support of their claim that smoking continues in DOCS facilities.  (Pl. Inj. Mem. 42.)  Defendants dispute plaintiffs' characterization of Gaes's testimony.  (Def. Inj. Reply 42-43.)  However, the Court is unable to evaluate the probative value of Gaes's statements because plaintiffs, inexplicably, did not include the relevant portion of Gaes's deposition in the record.

In their reply papers, defendants abandon their jurisdictional argument and instead argue that the record lacks sufficient evidence to support injunctive relief.[30]  (Def. Inj. Reply 39-49.) Defendants point out that virtually all of plaintiffs' evidence regarding the level of smoking in DOCS facilities predates the 2001 policy that prohibited smoking, and that therefore there is insufficient evidence in the record for a factfinder to conclude that *today*, as opposed to before 2001, plaintiffs are subjected to an unreasonable level of secondhand smoke to which defendants are deliberately indifferent.  (Id. 40-43.)  Indeed, the only admissible evidence plaintiffs present that postdates 2001 is Nathan's observation of full ashtrays in the facilities during his examination and Duncan's statements regarding compliance with the policy.[31]

Plaintiffs have failed to produce sufficient evidence to raise an issue of fact with respect to their claim based on secondhand smoke in double cells.  To survive summary judgement, plaintiffs must produce evidence from which a finder of fact could conclude that double-celled inmates, as a class, are subjected to "unreasonably high levels" of secondhand smoke, Warren, 196 F.3d at 333, "that pose an unreasonable risk of serious damage" to future health, Helling, 509 U.S. at 35.  In response to defendants' summary judgment motion, plaintiffs have produced

_____

[30] Defendants raised this argument specifically with respect to plaintiffs' secondhand smoke claims for the first time in their reply brief.  However, in their initial papers, defendants argued that plaintiffs' claims for injunctive relief, as a general matter, should be dismissed because plaintiffs relied on "stale" evidence from 1995 and 1996 that failed to show a continuing violation.  (Def. Inj. Mem. 111.)  Therefore, plaintiffs were on notice with respect to this argument as a general matter, and defendants' application and expansion of that argument specifically to plaintiffs' secondhand smoking claims created no unfair surprise.  In any event, plaintiffs have not requested leave to file a sur-reply on the issue.

[31] Statements by inmates that smoking continues in DOCS facilities, made to Nathan and recounted in his report, are hearsay and therefore cannot be relied upon to create an issue of fact to defeat summary judgment.  Fed. R. Civ. P. 56(e); see also Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

the testimony of seven class members stating that they were exposed to some level of secondhand smoke in a double cell eight or nine years prior to the filing of defendants' motion and five or six years prior to the implementation of defendants' smoking ban.[32]  Even assuming arguendo that each of these seven individual inmates was at one time exposed to unreasonably high levels of secondhand smoke, plaintiffs have produced nothing beyond this anecdotal evidence that double-celled inmates generally were subjected to an unconstitutional risk of harm due to secondhand smoke because of double-celling.  There is no evidence in the record that double-celling resulted in "the smell of smoke fill[ing] the air" in double cells, Davis, 316 F.3d at 100, or that smoking was "pervasive" in double cells, Denis v. N.Y.S. Dep't of Corr. Servs., No. 05 Civ. 4495, 2006 WL 217926, at *18 (S.D.N.Y. Jan. 30, 2006).  The record is simply devoid of evidence to support any conclusions or inferences about the extent of smoking in double cells generally, and therefore there is no evidence from which a finder of fact could infer that class members as a whole were exposed to unreasonably high levels of secondhand smoke. See, e.g., Zaire v. Artuz, No. 99 Civ. 9817, 2003 WL 230868, at *5 (S.D.N.Y. Feb. 3, 2003)

---

[32] Bailey was double-celled in 1995.  (Def. R. 56.1 Stmt. Bailey ¶ 2.)  Barnett was double-celled in 1995.  (Def. R. 56.1 Stmt. Barnett ¶ 2.)  Bermudez was double-celled in 1995.  (Def. R. 56.1 Stmt. Bermudez ¶ .)  Hunt was double-celled in 1996.  (Def. R. 56.1 Stmt. Hunt ¶ 1.)  Martin was double-celled in 1995.  (Def. R. 56.1 Stmt. Martin ¶ 1.)  Rivera was double-celled in 1995 and 1996.  (Def. R. 56.1 Stmt. J. Rivera ¶ 1.)  West was double-celled in 1995. (Def. R. 56.1 Stmt. West ¶ 1.)

It is not surprising that the testimony of these plaintiffs describes the conditions of double-celling as they existed in 1995 or 1996.  This suit was filed in 1995, and as named-plaintiffs the above-mentioned inmates would have had to have been double-celled during that period.  Plaintiffs, however, were not limited to the depositions of named plaintiffs to produce evidence of the level of secondhand smoke in the facilities at a time closer to the filing of this motion.  Plaintiffs' expert Nathan toured the facilities, and reported on the conditions of the cells he saw there.  Similar first-hand observations could have been obtained relating to secondhand smoke.  Alternatively, plaintiffs could have obtained sworn statements from inmates who were double-celled after the implementation of the 2001 smoking policy.

(granting summary judgment where plaintiff was only "periodically" exposed to secondhand smoke).

Moreover, during the period to which this evidence relates, smoking was permitted in DOCS facilities. To the extent that smoking was common in the prisons, inmates were surely exposed to secondhand smoke in a variety of institutional contexts. White it is logical to hypothesize that being confined in a double cell with a cellmate who smokes would aggravate the condition, plaintiffs offer no evidence that quantifies, or even attempts to document, any increased health risk from secondhand smoke exposure in double cells, as compared to the health risks resulting from confinement in a single cell on a cellblock populated by smokers.

Even if plaintiffs were able to show that class members were subjected to unconstitutional level of secondhand smoke in 1995 or 1996, there is no evidence in the record that would support a conclusion that such conditions continue to exist. To obtain injunctive relief, plaintiffs must show that inmates in double cells continue to be exposed to an unreasonable risk of harm from secondhand smoke. Farmer, 511 U.S. at 846. Plaintiffs admit that since "January 1, 2001, smoking is no longer permitted anywhere inside DOCS facilities." (Def. R. 56.1 Stmt. ¶ 54; Pl. R. 56.1 Stmt. ¶ 54.) However, while plaintiffs allege that the ban is not strictly followed, the only admissible evidence they cite to support this claim is Nathan's observation of full ashtrays in some cells (Nathan Rep. 21) and Duncan's testimony that some smoking inside double cells still occurs (Duncan Dep. 105-106). This evidence is insufficient to show that, despite defendants' smoking policy, plaintiffs continue to be subjected to unreasonably high levels of secondhand smoke in double cells.

Nathan's observation of full ashtrays does not create an issue of fact in connection with plaintiffs' double-celling claim, because Nathan does not indicate whether the ashtrays he observed were in single cells or double cells, whether the cigarettes in those ashtrays were smoked when cellmates were present, or the period of time over which the ashtray was filled. Nathan's report does not state that he observed any secondhand smoke in the facilities during his visit, nor does it state that he observed any smoking in double cells in particular. In short, Nathan's report does not provide any evidence relating to the level of secondhand smoke in double cells. Based on Nathan's observations, a finder of fact could conclude that there is *some* level of secondhand smoke in the DOCS facilities. However, a finder of fact could not conclude, based on Nathan's observation of full ashtrays, that double-celling results in exposure to unreasonably high levels of secondhand smoke.

Plaintiffs' reliance on Duncan's statements is similarly unavailing. During his deposition, Duncan admitted that before the smoking policy took effect, he believed that some smoking would continue despite the policy. (Duncan Dep. 105-06.) However, Duncan's testimony does not provide any evidence of the level of smoking that currently exists in DOCS facilities or the level of smoking in double cells specifically. Furthermore, Duncan's acknowledgment of continued smoking is not evidence of the policy's current failure or lack of enforcement, but rather was part of an explanation of his opinion that despite the smoking ban, DOCS should continue to have policies relating to smoking because it would be foolish to simply ignore the issue in light of the regulation. (Id.)[33]

_____

[33] In contrast to plaintiffs' reliance on statements of inmates from 1995 and 1996, defendants point to the deposition testimony of plaintiff Allah, in which he stated that "just recently [DOCS] banned smoking throughout the facility. There is no more smoking inside the

It is difficult to believe that the smoking policy has completely eliminated smoking at DOCS facilities. Common sense suggests that some smoking, perhaps even a lot of smoking, continues despite the policy. At trial, however, plaintiffs would have the burden to prove that they were exposed to unreasonably high levels of secondhand smoke as a result of defendants' double-celling practices. In meeting that burden, plaintiffs could not simply invite the finder of fact to speculate as to the extent of smoking in double cells. Instead, plaintiffs must present *evidence* to support their claim. Plaintiffs completely fail to present evidence that double-celled inmates continue to face unreasonably high levels of secondhand smoke.

Plaintiffs have failed to raise an issue of fact with respect to the objective injury prong of their secondhand smoke claim. However, even if plaintiffs were able to raise an issue of fact regarding the risk of injury, they have failed to present evidence from which a finder of fact could conclude that defendants are deliberately indifferent to that risk.

An evaluation of defendants' state of mind must take into account defendants' "current attitudes and conduct and any policies that have been enacted." Warren, 196 F.3d at 333. In that regard, "the adoption of [a] smoking policy . . . will bear heavily on the inquiry into deliberate indifference." Helling, 509 U.S. at 36. There is no dispute that defendants have enacted a policy that bans smoking throughout DOCS facilities. Plaintiffs merely assert that the policy is not enforced. However, as discussed above, plaintiffs present hardly a scintilla of evidence

_____

doors . . . so if you are in a double bunk with somebody . . . you don't have to worry about the smoking." (Allah Dep. 126-27.) This is the only evidence presented by either party relating to the actual level of smoking in double cells after the implementation of the smoking ban in 2001. While Allah's testimony would clearly be relevant to a factfinder, if plaintiffs' evidence sufficed to raise a material issue of fact, Allah's contrary testimony could not support a finding as a matter of law in defendants' favor.

regarding the level of smoking after the enactment of the DOCS policy. Although Nathan's observation of full ashtrays is evidence of some degree of noncompliance, the mere fact of some degree of noncompliance is insufficient to show that defendants are deliberately indifferent. See Johnson v. Goord, No. 01 Civ. 9587, 2004 WL 2199500, at *17 (S.D.N.Y. Sept. 29, 2004) (granting summary judgment for period in which plaintiffs presented only "anecdotal evidence" of smoking and "failed to demonstrate anything more than isolated instances of noncompliance with [a] smoking ban"). Without sufficient evidence to support a finding that defendants are deliberately indifferent to the risks associated with secondhand smoke, plaintiffs have failed to raise an issue of fact with respect to the subjective prong of their secondhand smoke claim.

IV. Plaintiffs' First Amendment Injunction Claims

    A. The Injunctive Relief Sub-Classes Do Not Assert First Amendment Claims

Before addressing the merits of plaintiffs' First Amendment injunctive claims, the Court must dispel some confusion regarding the procedural posture of these claims. Defendants, in their initial papers, argue that the Eighth Amendment claim on behalf of the Attica subclass should be dismissed because the Attica class representative, Abdul, raises only a First Amendment claim. (Def. Inj. Mem. 20.) Defendants seem to assume that the Attica subclass's First Amendment claims should remain intact. Plaintiffs, in their response, title the section discussing their First Amendment claims: "There Are Disputed Issues of Material Fact Regarding Whether Defendants Violated the *Class'[s]* Free Exercise Rights." (Pl. Inj. Mem. 44, emphasis added.)

Despite both parties' focus on the First Amendment claims of the injunctive relief subclasses, it appears that plaintiffs have not actually advanced any *class* claims under the First

Amendment, and that no class has ever been certified to bring class claims on behalf of "Muslim Plaintiffs" (Pl. Inj. Mem. 45), as the purported class is described by plaintiffs. The operative complaint in this action, the third consolidated and amended complaint, sets out plaintiffs' causes of action. The first cause of action alleges that defendants' policy of double-celling violates the Eighth and Fourteenth Amendment rights of "Plaintiffs and the Double-Celling Class." (3d Consol. Am. Compl. ¶ 141.) The second cause of action alleges that defendants' policy of double-celling violates the Fourteenth Amendment due process rights of "Plaintiffs and the Double-Celling Class." (Id. ¶ 143.) However, with respect to plaintiffs' First Amendment claim, the third cause of action alleges that defendants' policy of double-celling violates the First and Fourteenth Amendment rights of "Plaintiffs Nelson, Martin, Allah, Brown, Muntaqim, DeVonish, Abdul, Walsh, Bomani and McFadden, among others."[34] (Id. ¶ 145.) There is no mention of any "class" in plaintiffs' third cause of action, and therefore plaintiffs' First Amendment claims appear to be brought only by the individual plaintiffs listed in the complaint.

The conclusion that plaintiffs have not stated a class claim for injunctive relief is supported by this Court's opinion certifying the plaintiff class. Plaintiffs' free exercise claims were dismissed in that opinion, but plaintiffs were granted leave to replead their First Amendment claims within thirty days. Jones, 190 F.R.D. at 110. After dismissing plaintiffs' First Amendment claims, the Court applied Fed. R. Civ. P. 23(a)'s requirements to plaintiffs' remaining claims and determined that certification of the double-celling class for injunctive relief was appropriate. Id. 110-13. In the course of concluding that the plaintiff class satisfied Rule 23(a)'s commonality requirement, the Court stated, "Common questions of law and fact

---

[34] Plaintiffs do not identify the "others" mentioned in the third cause of action.

clearly exist in this action. Plaintiffs allege, inter alia, that the practice of double-celling inmates

. . . violates their *Eighth Amendment* rights." Id. at 112 (emphasis added). In applying Rule 23's

requirements and certifying the double-celling class, the Court did not consider plaintiffs' First

Amendment claims, no doubt because those claims had been dismissed; specifically, the Court

did not address the potential conflict that could result from certifying a class to advance First

Amendment claims on behalf of a religious subset of the class without separately certifying that

subset as a subclass. As a general matter, named plaintiffs are "empowered to represent

members of the class solely with respect to [claims] in which all members of the class [have] a

common interest." Nat'l Super Spuds, Inc. v. New York Mercantile Exch., 660 F.2d 9, 17 (2d

Cir. 1981).

In this case, plaintiffs' claims on behalf of "Muslim Plaintiffs" (Pl. Inj. Mem. 45) could

very well be counter to the interests of other members of the double-celling class. For instance,

if defendants are not permitted to double cell Muslim inmates, fewer inmates will be eligible for

double-celling and the number of single cells available to non-Muslims will decrease. As a

result, the practice, contested by plaintiffs, of forcing inmates to choose between sharing a

double cell or being transferred to a different facility could be exacerbated for non-Muslim

inmates.

This particular potential conflict is mentioned only by way of example; the Court

expresses no opinion as to whether certification would have been granted had the Court

considered plaintiffs' First Amendment claims. The point is that the Court *did not* examine any

potential conflicts within the class because plaintiffs' First Amendment claims had been

dismissed. Plaintiffs did replead their First Amendment claims, but at no point did plaintiffs

move for class certification with respect to those claims.  Accordingly, no class was certified.

B. <u>Plaintiffs' Individual Injunctive Claims Are Not Moot</u>

Defendants argue that the individual plaintiffs lack standing to seek injunctive relief on their First Amendment claims because they have either been released from DOCS custody or are no longer being double-celled.  (Def. Inj. Mem. 111.)  As an initial matter, defendants misstate their argument.  Standing is determined at the time a complaint is filed, <u>see</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 184 (2000) (rejecting challenge to plaintiffs' standing because "unlawful conduct . . . was occurring at the time the complaint was filed"), and defendants do not argue that the individual plaintiffs were not double-celled in 1995 and 1996, when the complaints in this and related actions were filed (Def. Inj. Mem. 111).  Whether plaintiffs' claims for injunctive relief can continue to go forward now that plaintiffs are no longer double-celled is a question of mootness, not standing.

The fact that plaintiffs' First Amendment injunctive claims are individual claims and not class claims alters the determination of whether those claims are now moot.  If the individuals were named plaintiffs representing a class, then the mooting of the individual claims would not moot the claims of the class as a whole.  <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 51 (1991).  However, because the individual plaintiffs do not represent a class with respect to their First Amendment claims, the mootness of their claims for injunctive relief must be evaluated as of the time defendants' summary judgment motion was filed.

Plaintiffs do not dispute the fact that at the time defendants filed their summary judgment motion, none of the individual plaintiffs advancing First Amendment injunctive claims was

being double-celled in alleged violation of his First Amendment rights.[35]  However, "[i]t is well

settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal

court of its power to determine the legality of the practice.'" Friends of the Earth, 528 U.S. at

189, quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).  A defendant

seeking to dismiss a case on grounds of mootness has "the 'heavy burden of persuad[ing]' the

court that the challenged conduct cannot reasonably be expected to" continue or be repeated.

Friends of the Earth, 528 U.S. at 189, quoting United States v. Concentrated Phosphate Export

Ass'n, 393 U.S. 199, 203 (1968) (alteration in original).  A case becomes moot only if

"subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not

reasonably be expected to recur."  Friends of the Earth, 528 U.S. at 189 (internal quotation marks

omitted).

    With respect to most of the individual plaintiffs, defendants have failed to meet the heavy

burden of showing that the plaintiff will not be double-celled again in alleged violation of his

First Amendment rights.  The record shows that many of the plaintiffs were double-celled on

numerous occasions for short periods of time.  (See, e.g., Def. R. 56.1 Stmt. Muntaqim ¶ 1; Def.

R. 56.1 Stmt. McFadden ¶ 1; Def. R. 56.1 Stmt. Abdul ¶ 1.)  The policy of double-celling

inmates continues at defendants' facilities, and therefore it is possible that those individual

plaintiffs who are still in DOCS custody will once again be placed in a double cell.  Accordingly,

the claims of plaintiffs Martin, Allah, Muntaqim, DeVonish, Abdul, Walsh, and McFadden are

---

[35] In fact, plaintiffs don't respond to any of defendants' arguments regarding mootness or standing to seek injunctive relief.

not moot.[36]

C. Plaintiffs' Claims for Injunctive Relief Under the First Amendment

Plaintiffs' third consolidated and amended complaint alleges that defendants' practice of double-celling impairs the ability of individual plaintiffs "to practice their religion, in violation of the First and Fourteenth Amendments." (Compl. ¶ 145.) Claims brought by prisoners alleging a violation of the Constitution, including First Amendment claims, are controlled by the Supreme Court's decision in Turner v. Safley, which states that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987).

Our Court of Appeals has not yet determined the showing necessary for a plaintiff to meet Turner's "impinge[ment]" requirement. Various other courts of appeals have adopted a "substantial burden" requirement. See McEachin v. McGuinnis, 357 F.3d 197, 202-03 (2d Cir. 2004). This Circuit, however, has neither adopted nor rejected that standard, and instead has explained that a claim of "significant[] interfere[nce] with . . . religious beliefs" is sufficient to

---

[36] This conclusion cannot be applied to the First Amendment claim for injunctive relief advanced by plaintiff Asim Abdullah Bomani. Bomani was released from DOCS custody in 1998. (Def. R. 56.1 Stmt. Bomani ¶ 1.) Therefore, while defendants' policy of double-celling continues, Bomani is no longer under defendants' control, and so that policy no longer affects him. This Court cannot reasonably project that Bomani will once again be arrested, tried, convicted, sent to a maximum security prison in New York, and double-celled in a manner that conflicts with his practice of Islam. See Defunis v. Odegaard, 416 U.S. 312, 318-20 (1974). Accordingly, Bomani's claim for injunctive relief under the First Amendment is dismissed as moot. The exception to the mootness doctrine for cases that are capable of repetition, yet evading review does not alter this conclusion. First, because Bomani is no longer in defendants' custody, the alleged violation is no longer capable of repetition with respect to him. Second, in light of this Court's determination that other plaintiffs' claims for injunctive relief are not moot, defendants' actions have not and will not evade review.

The Court has already dismissed the individual claims of Isaac Nelson and Lundien Brown by order dated August 22, 2002, for failure to comply with discovery. (Doc. #134.)

state a constitutional claim. Id. at 203. In this regard, an inmate's "sincere belief" that a particular religious observance is "critical" to the practice of his religion is relevant. Ford v. McGinnis, 352 F.3d 582, 594 (2d Cir. 2003). "The relevant question . . . is whether [a particular activity] is considered central or important to [*the inmate's*] practice of" his religion. Id. at 593-94 (emphasis added). Testimony from religious authorities that the observance in question is not important or is not actually burdened by defendants' regulations is not determinative of the issue. Id.

Once a plaintiff makes the necessary showing regarding a regulation's effect on his religious beliefs, the question becomes whether defendants' conduct is "reasonably related to some legitimate penological interests." Id.; see also Turner, 482 U.S. at 89. Four factors are relevant to determining whether a given regulation is reasonable under Turner:

> 1)  A "valid and rational connection" between the regulation and the legitimate governmental interest that justifies it.
> 2)  Whether there are alternative means of exercising the burdened practice available to the inmates.
> 3)  The effect an accommodation would have on prison resources.
> 4)  Whether there exist any affordable alternative regulations or practices that would accommodate the inmates' religious practices "without compromising valid penological interests."

See Ford, 352 F.3d at 595; see also Turner, 482 U.S. at 89-91. Plaintiffs have the burden of showing that a given prison regulation is unreasonable. Giano v. Senkowski, 54 F.3d 1050, 1054 (2d Cir. 1995). Therefore, while this Court "must draw all reasonable inferences in [a plaintiff's] favor for purposes of summary judgment, [a plaintiff] must still meet his burden of proving [the challenged regulation] irrational to avoid dismissal." Id.

Plaintiffs claim that defendants' policy of double-celling prevents them from practicing their religion because there is insufficient room to pray in a double cell, a cellmate may render a

cell unclean and therefore unfit for prayer, several prayers must be made in solitude, certain rituals require privacy which is not available in a double cell, and the morning call to prayer could disturb a sleeping cellmate. (Compl. ¶ 111.) For purposes of this motion, the Court will assume without deciding that a factfinder could conclude that defendants' double-celling policy substantially burdens the aforementioned religious practices. Despite this assumption, plaintiffs' claims for injunctive relief under the First Amendment fail as a matter of law.

Defendants assert that their double-celling policy "is rationally related to the goal of finding sufficient bed space to house all maximum security inmates, while being able to rotate inmates out of double cells so as to limit the length of time any one inmate must spend involuntarily in a double cell." (Def. Inj. Mem. 103.) The need to house each inmate in a cell is indeed a "legitimate" interest for DOCS, and placing two inmates in a single cell is "reasonably related" to that interest. Each inmate needs to be in a cell, and if there are more inmates than cells, placing two inmates in one cell is, on its face, a reasonable solution.

In response to defendants' proffered justification for double-celling, plaintiffs completely fail to produce any evidence or make any arguments to satisfy their burden of showing that defendants' policy is unreasonable under the <u>Turner</u> factors.[37] In their memorandum in support of injunctive relief, plaintiffs argue that double-celling is not related to a government interest because inmates are not respectful of plaintiffs' religious practices, and because even when a disrespectful cellmate is replaced by DOCS, the replacement is often equally disrespectful of

---

[37] This failure is no doubt due in part to plaintiffs' newfound reliance on RLUIPA in support of their claims for injunctive relief. If plaintiffs were correct that <u>Turner</u> did not govern their claims, then there would be no need to produce the kind of evidence that <u>Turner</u> requires. However, even in the context of their individual claims for damages, where they admit that <u>Turner</u> applies, plaintiffs' claims suffer the same evidentiary defect. (Pl. Damages Mem. 48.)

plaintiffs' religion.  (Pl. Inj. Mem. 46.)  These assertions, however, go to the burden on

plaintiffs' religious practice; they have no relation to any of the four above-mentioned <u>Turner</u>

factors regarding the reasonableness of defendants' policy.

Short of exempting the individual Muslim plaintiffs from double-celling altogether,

plaintiffs offer no alternative solution that would accommodate their religious needs, nor do they

attempt to explain how the requested exemption could be applied without compromising the

legitimate penological interest in distributing the burden of double-celling equally among

prisoners.  Additionally, the record contains evidence of the existence of acceptable alternatives

for the practices plaintiffs allege are burdened by double-celling.  If an inmate is unable to pray

on the floor because of clutter in a double cell, he can rearrange the cell or pray on his bed.  (<u>See</u>,

<u>e.g.</u>, Abdul I Dep. 41.)  If a cell becomes unclean because of a dirty cellmate, an inmate can

clean the cell himself.  (<u>See</u>, <u>e.g.</u>, <u>id</u>. at 58-59.)  Prayers that need to be recited in solitude can be

made up at a later time when a cellmate is away.  (<u>See</u>, <u>e.g.</u>, Allah Dep. 115-16.)  Rituals that

require privacy can also be performed when a cellmate is away, or can be performed behind a

privacy curtain.  (See Def. Inj. Mem. 101.)  Lastly, the morning call to prayer need not be said so

loudly as to wake a sleeping cellmate.[38]  Plaintiffs do not contend that any of these alternatives

are unacceptable.  Nor do they contend that the burdens on religious practice from double-celling

go beyond merely limited interference with religious observance.  Defendants' double-celling

policy does not directly restrict or prohibit the practice of Islam, and, with the exception of the

---

[38] Plaintiffs do not explain how the effect of an inmate's prayer on his sleeping cellmate results in a violation of the inmate's First Amendment rights.  In such a situation it is the inmate's concern for the comfort of his cellmate, and not defendants' double-celling policy, that inhibits the practice of his religion.

particular burdens mentioned above, plaintiffs do not present any evidence that they have been widely burdened in their religious exercise.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-52 (1987) ("respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations").

In the absence of evidence, plaintiffs seek to rely on the Second Circuit opinion in Salahuddin v. Coughlin, 993 F.2d 306 (2d Cir. 1993), to salvage their claims.  In Salahuddin, the Court of Appeals reversed the district court's dismissal of the plaintiff's free exercise claim because the Court concluded that whether defendants' actions were reasonable "remain[ed] very much an open question."  Id. at 310.  Plaintiffs latch on to this language, and argue that here too, the reasonableness of defendants' double-celling policy is an open question, and therefore summary judgment should be denied.  (Pl. Damages Mem. 47-48.)  Additionally, plaintiffs argue that whether inmates had alternative means to practice their religion is a factual issue that precludes a grant of summary judgment.  (Id. 48.)

Plaintiffs suffer from a fundamental misunderstanding of summary judgment.  The simple observation that an element of plaintiffs' claim depends on facts does not defeat a summary judgment motion.  Virtually *every* element of *any* cause of action depends on facts.  When the success of a claim depends on the existence of evidence, the party who has the burden to prove the claim at trial has the burden to produce evidence from which a reasonable finder of fact could conclude that the party has met its burden of proof.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  If, based on the evidence in the record at summary judgment, no reasonable factfinder could find for a party on a given claim, then judgment is entered against that party as a matter of law.  In this case, plaintiffs have the burden to prove each element of their First

Amendment claims at trial, and therefore they have the burden to produce evidence to support those claims in response to defendants' summary judgment motion. They have failed to do so, and so their claims for injunctive relief will be dismissed.

Salahuddin does not compel a different conclusion. The Salahuddin Court reversed and remanded the district court's dismissal of plaintiff's claims because plaintiff had not yet obtained any discovery from defendants. 993 F.2d at 308. It was the Court's opinion that further discovery would help determine the reasonableness of defendants' actions. In Salahuddin, the plaintiff had not yet had the opportunity to assemble evidence in support of his claim, and so the Court of Appeals gave him time to engage in "adequate discovery" before responding to a motion for summary judgment. Id. at 310. Plaintiffs quote Salahuddin's language regarding "the absence of adequate discovery," implying that adequate discovery has not yet taken place in this matter. (Pl. Damages Mem. 47.) Plaintiffs undertook almost four years of discovery that resulted in a summary judgment record containing almost thirty binders of material; such discovery is certainly "adequate."

This Court is under no obligation to engage in an exhaustive search of the record for evidence in support of plaintiffs' claims if they fail to provide it. See Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470-71 (2d Cir. 2002). Plaintiffs have the burden of establishing the unreasonableness and irrationality of defendants' policy in light of the four Turner factors. They have failed to offer any evidence or analysis relating to any of the relevant considerations. Therefore, on the evidence before the Court, no finder of fact could find for plaintiffs on their claims for injunctive relief under the First Amendment, and accordingly those claims will be dismissed.

D.  <u>Plaintiffs Do Not Assert a Claim Under RLUIPA</u>

As stated above, plaintiffs' third consolidated and amended complaint asserts a claim based on defendants' alleged impairment of plaintiffs' ability to "practice their religion, in violation of the First and Fourteenth Amendments."  (Compl. ¶ 145.)  That is the only cause of action in the complaint related to religious freedom.  However, in their response papers plaintiffs assert, for the first time, that their First Amendment claims should be governed by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, which prohibits prison policies and regulations that "impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the policy or regulation "is in furtherance of a compelling government interest[] and . . . is the least restrictive means of furthering that compelling government interest."  <u>Id</u>. § 2000cc-1(a).

Plaintiffs' operative complaint does not mention RLUIPA – an understandable omission since RLUIPA did not become law until one year after the third consolidated and amended complaint was filed.  However, plaintiffs did not move to amend the complaint in the four years between the passage of RLUIPA and the filing of defendants' summary judgment motion, nor do plaintiffs *now* seek to amend the complaint to add a claim under RLUIPA.  Rather, plaintiffs simply claim that because RLUIPA exists it therefore governs their First Amendment claims, despite the fact that they do not specifically assert a violation of RLUIPA in the complaint.

To the extent that plaintiffs argue that RLUIPA controls all First Amendment claims brought by prisoners, they are incorrect.  RLUIPA is an independent cause of action, not a directive to courts instructing how evaluate claims brought under the First Amendment.   Under RLUIPA, an inmate "may assert a . . . claim . . . in a judicial proceeding and obtain appropriate

relief against a government." 42 U.S.C. § 2000cc-2(a). Nothing in the text of the statute requires a federal court to apply RLUIPA in all cases where it could be applied. Rather, the statute says that the claim may be "assert[ed]," implying that some affirmative action is required by the party relying on the statute. Additionally, by using the permissive auxiliary verb "may," the statute indicates that assertion of the claim is not automatic, but rather is a matter of choice on the part of the plaintiff.

District courts in this circuit have adopted this approach, and treat claims under the First Amendment and under RLUIPA as separate causes of action. For example, in Marria v. Broaddus, 200 F. Supp. 2d 280 (S.D.N.Y. 2002), the plaintiff advanced claims under both the First Amendment and RLUIPA. The district court, in denying defendants' motion for summary judgment on plaintiff's religious freedom claims, analyzed the evidence in the record separately under both First Amendment principles and the provisions of RLUIPA. Id. at 293-99 (applying Turner's "reasonable relation" test and RLUIPA's "compelling interest" test); see also Keesh v. Smith, No. 04 Civ. 0779, 2006 WL 516793 (N.D.N.Y. Mar. 2, 2006) (evaluating plaintiff's motion for preliminary injunction under both Turner and RLUIPA). Courts of appeals in other circuits have agreed.[39]

_____

[39] See, e.g., Henderson v. Terhune, 379 F.3d 709, 715 n.1 (9th Cir. 2004) (noting that plaintiff brought claim under the First Amendment, not RLUIPA, and therefore refusing to apply RLUIPA standard); Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 983 n.1 (8th Cir. 2004) (evaluating plaintiff's First Amendment claim under Turner and evaluating plaintiff's "statutory free exercise" claim under RLUIPA); Freeman v. Tex. Dep't of Crim. Justice, 369 F.3d 854, 858 n.1 (5th Cir. 2004) (noting the Court's "surpris[e]" at the plaintiff class's decision to bring the case under the First Amendment and not RLUIPA, and applying Turner to plaintiffs' claims); cf. Hammons v. Saffle, 348 F.3d 1250, 1258-59 (10th Cir. 2003) (upholding grant of summary judgment against plaintiff on First Amendment claim, but remanding to district court to allow pro se plaintiff to raise RLUIPA claim).

In support of their argument that their First Amendment claim should be evaluated as a RLUIPA claim, plaintiffs rely on McEachin v. McGuinnis, which states that "'the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.'" 357 F.3d 197, 199 n.2 (2d Cir. 2004), quoting Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir. 1997).[40]  Plaintiffs' reliance is misplaced.  McEachin involved a motion to dismiss filed prior to the taking of any discovery.  Northrop, the case quoted by McEachin, makes clear that the statement relied on by plaintiffs applies to motions to dismiss under 12(b)(6) in light of "the liberal pleading principles" of Fed. R. Civ. P. 8.  134 F.3d at 46.  After years of discovery, and almost ten years of litigation, plaintiffs cannot bring a new claim at this late hour by relying on the accommodating procedural allowances appropriate for initial pleadings.[41] Furthermore, McEachin involved a pro se plaintiff, and the liberal reading of pleadings afforded to pro se litigants is not applicable when plaintiffs are represented by sophisticated counsel, as they are here.  Plaintiffs have stated their claims, and those claims are what they are.

Plaintiffs do not assert a RLUIPA claim the operative complaint, they did not amend their complaint in the four years after the passage of RLUIPA to include such a claim, and on this

---

[40] Despite raising a RLUIPA claim for the first time in this litigation in their response to defendants' summary judgment motion, plaintiffs defend the inclusion of this apparently new statutory claim with only two lines in a footnote.  (Pl. Inj. Mem. 44 n.10.)

[41] Our Court of Appeals has explained that the liberal pleading requirements of Fed. R. Civ. P. 8 function only in conjunction with the rules regarding discovery and summary judgment. At the pleading stage, bare factual assertions are sufficient because discovery and summary judgment will, at some point during the litigation, serve to narrow and define the relevant issues. Wynder v. McMahon, 360 F.3d 73, 77 n.6 (2d Cir. 2004).  Plaintiffs' attempt to add a statutory claim at this late stage in the litigation, after the completion of discovery and after the filing of a motion for summary judgment, frustrates the system of efficient and fair litigation created by the Federal Rules.

motion for summary judgment they do not seek leave to amend their complaint.  In any event, even if the Court were to interpret plaintiffs' statement that the complaint "supports a claim under" RLUIPA (Pl. Inj. Mem. 44) as a request for leave to amend the complaint, that request would be denied as untimely.

Leave to amend a complaint "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Our Court of Appeals has explained this provision of the Rule as follows:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given."

United States ex rel. Mar. Admin., 889 F.2d at 1254.  In this case, plaintiffs waited until their response to defendants' summary judgment motion to raise their RLUIPA claim.  That delay was undue, and an amendment at this time would result in prejudice to defendants.  Therefore justice does not require granting leave to amend the complaint

"[C]ourts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."  Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (quotations omitted).  Plaintiffs' RLUIPA claim would indeed be "new," despite the fact that plaintiffs allege violations of their First Amendment rights in the third amended complaint.  Under RLUIPA, defendants would have the burden of persuasion to establish the double-celling policy furthers a compelling government interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-2(b) (stating that plaintiff has burden to show a substantial burden and the government has the burden on all other elements).  Under the First Amendment defendants face no such burden, not only

because the substantive elements of the claims are different, but also because plaintiffs have the burden of persuasion on all elements of a First Amendment claim. See Giano, 54 F.3d at 1054.

The parties engaged in almost four years of discovery based on the third amended complaint, which asserted a claim under the First Amendment. Under that claim, defendants had no burden to produce evidence to support a showing that the double-celling policy furthered a compelling state interest or that the policy was the least restrictive means by which to achieve that interest. Accordingly, defendants did not compile a record with an eye toward meeting those burdens. (See Def. Inj. Reply 50.) Accordingly, plaintiffs' delay in raising their RLUIPA claim until after the close of discovery and after defendants' motion for summary judgment prejudiced defendants. Beckman, 79 F. Supp. 2d at 407. If the Court were to allow plaintiffs to add a RLUIPA claim now, the Court would also be required to reopen discovery to allow defendants to create an appropriate record. After over ten years of litigation and almost four years of discovery, justice does not require such a result.

The length of the delay also supports denying leave to amend the complaint. RLUIPA was passed in 2000, yet plaintiffs waited until 2004 to raise their claim in response to defendants' summary judgment motion. In the absence of any justification for such a lapse of time – and none is provided – plaintiffs' four year delay must be considered undue. See, e.g., John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994) (noting that plaintiff filed amended complaint four months after deadline). The delay is exacerbated by the fact that even now plaintiffs do not formally request leave to amend; they simply raise the applicability of RLUIPA in their response papers. See, e.g., Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996) (upholding denial of leave to amend based in part on fact that

plaintiff raised issue in response to defendant's motion and never "formally requested leave to amend her complaint").

A RLUIPA claim, like any other claim, can be waived if it is not brought in a timely fashion. In <u>Fifth Avenue Presbyterian Church v. City of New York</u>, 293 F.3d 570 (2d Cir. 2002), the Court of Appeals reviewed a district court's grant of a preliminary injunction, evaluated plaintiffs' religious freedom claim under the First Amendment, and did not "express any opinion" on plaintiffs' RLUIPA claim because it was raised for the first time on appeal. <u>Id</u>. at 576. The recognition by the Court of Appeals that a plaintiff can waive a RLUIPA claim while advancing a First Amendment claim illustrates that RLUIPA is an independent cause of action that can be waived if not brought in a timely manner.

The recent decision in <u>Hankins v. Lyght</u>, 441 F.3d 96 (2d Cir. 2006), does not compel a different conclusion. <u>Hankins</u> involved a private suit under the Age Discrimination in Employment Act ("ADEA") against the New York Annual Conference of the United Methodist Church. The Court of Appeals held that the Religious Freedom Restoration Act ("RFRA"), a statute for all relevant purposes identical to RLUIPA,[42] could provide a defense to plaintiff's ADEA claim if application of the ADEA to defendants would substantially burden their exercise of religion. <u>Id</u>. at 103. In the portion of the opinion relevant to the current inquiry, the Court of Appeals determined that defendants had not waived their RFRA defense, despite the fact that

---

[42] RLUIPA and RFRA both generally prohibit governments from placing substantial burdens on the exercise of religion. The operative language of the two statutes is virtually identical. <u>Compare</u> 42 U.S.C. § 2000cc-2(a), <u>with</u> 42 U.S.C. § 2000bb-1(c). The main difference between the two statutes lies in their scope. RLUIPA reaches state law, but only state law involving land use and prisons. RFRA does not reach state law, but it is not limited to land use and prison regulations.

defendants informed the Court of Appeals via letter-brief that they did not wish to raise the defense because they believed RFRA was inapplicable.  Id. at 104.

The Court of Appeals's determination that the defendants in Hankins did not waive their RFRA defense does not alter this Court's determination that defendants here have waived any potential RLUIPA claim.  As an initial matter, the Hankins Court recognized that a RFRA claim, and presumably therefore a RLUIPA claim as well, can be waived.  Id., citing United States v. Amer, 110 F.3d 873, 879 & n.1 (2d Cir. 1997).  Additionally, the Court of Appeals relied on two factors not present here.  First, the Court of Appeals stated that throughout the litigation, in both the district court and on appeal, the defendants argued that application of the ADEA substantially burdened their religion.  Id.  Because RFRA protects against laws that "impose a substantial burden" on religion – employing the same operative language as RLUIPA – the Court was of the opinion that the defendants' reliance on the protection afforded by RFRA, while at the same time disavowing the applicability of RFRA, was akin to "ask[ing] [the Court] to apply RFRA, but not to mention it."  Id.  In the instant matter, plaintiffs raise for the first time in their responsive memorandum a claim that defendants' double-celling policy substantially burdens their religious practices.  Prior to submitting their memorandum, plaintiffs complained that defendants "impaired the ability of Plaintiffs . . . to practice their religion, in violation of the First and Fourteenth Amendments."  (Compl. ¶ 145.)  Plaintiffs' initial argument, far from mirroring the protections of RLUIPA, more closely tracked the protections set out in Turner, which prohibits regulations that "impinge[]" on inmates' constitutional rights.  482 U.S. at 89. Accordingly, this Court is only *now* being asked to apply the language of RLUIPA, and has not been continuously asked to apply the language without mentioning the statute – the sort of legal

gymnastics at which the Court of Appeals scoffed in Hankins.

Second, the Hankins Court viewed RFRA not simply as a defense to plaintiff's ADEA claim, but rather as an amendment to and limitation on the ADEA itself. Id. ("We are required to interpret federal statutes as they are written – in this case the ADEA as amended by the RFRA . . . ."). Therefore, defendants' failure to raise a RFRA defense or even their affirmative renunciation of such a defense did not release the Court of Appeals from its obligation to apply the law – "the ADEA as amended by the RFRA," id. – to plaintiff's claims. This aspect of the Hankins reasoning is wholly inapplicable to the case before this Court. Here, plaintiffs' cause of action is brought under 42 U.S.C. § 1983, and their claim is that defendants have violated their federal rights under the First Amendment. RLUIPA cannot be read to "amend" § 1983 because § 1983 merely provides a cause of action for the deprivation of federal rights; it does not create any substantive rights that could be altered or limited by RLUIPA. The First Amendment does create substantive rights, but the rights and protections of the First Amendment cannot be altered by Congress. See City of Boerne v. Flores, 521 U.S. 507 (1997). Therefore, to the extent that the Court of Appeals's reasoning was predicated on the existence of a cause of action provided by a federal statute that had been substantively altered by the passage of RFRA, Hankins is inapposite to the instant matter.[43]

_____

[43] Defendants' double-celling policy may indeed be affected by RLUIPA, but that effect is not properly characterized as an "amendment." As discussed above, RLUIPA provides a cause of action that may be asserted to challenge certain state practices, and under the reasoning of Hankins RLUIPA may limit the scope of certain federal causes of action. However, Hankins does not command this Court to assert on plaintiffs' behalf an independent cause of action that, to this point, they have not asserted themselves. The effect of RLUIPA on defendants' double-celling policy will be decided, if at all, in a case in which the plaintiffs actually bring a RLUIPA claim.

Finally, any tension between the holdings in <u>Fifth Avenue</u> (which found a waiver) and <u>Hankins</u> (which did not) must be resolved in favor of <u>Fifth Avenue</u> because this case, like <u>Fifth Avenue</u>, involves RLUIPA, while <u>Hankins</u> involved RFRA. Despite the fact that there is "no meaningful difference between RFRA and RLUIPA that could justify . . . inconsistent results," <u>Hankins</u>, 441 F.3d at 111 (Sotomayor, J., dissenting), on the issue of waiver, <u>Hankins</u> did not overrule <u>Fifth Avenue</u>,[44] and this Court remains bound by Court of Appeals precedent regarding the application of RLUIPA. <u>Cf</u>. <u>id</u>. (Sotomayor, J., dissenting) ("It is impossible to square our refusal to consider plaintiff's belated RLUIPA claim in <u>Fifth Avenue Presbyterian Church</u> with our refusal to recognize the defendant's *voluntary waiver* of a RFRA defense in the instant case.").

The third amended complaint does not include a claim under RLUIPA, and plaintiffs do not now seek to amend the complaint to add such a claim. In any event, any amendment would be untimely, as plaintiffs have waived any possible claim under RLUIPA. As stated above, no finder of fact could find for plaintiffs on their claims for injunctive relief under the First Amendment. The mere mention of RLUIPA in their response memorandum does not alter that conclusion.

V.  <u>Plaintiffs' Due Process Claims</u>

The third consolidated and amended complaint includes a cause of action alleging that defendants' double-celling policy and practice violated plaintiffs' due process rights under the Fourteenth Amendment. (Compl. ¶ 143.) That claim was dismissed in a prior opinion. <u>See</u>

---

[44] A panel of the Court of Appeals is bound by the prior decisions of other panels unless those decisions are overruled by the Supreme Court or the Court of Appeals sitting *en banc*. <u>In re Sokolowski</u>, 205 F.3d 532, 534-35 (2d Cir. 2000).

Jones, 190 F.R.D. at 109 ("plaintiffs' second cause of action for violation of their due process rights under the Fourteenth Amendment is dismissed").  Subsequently, plaintiffs filed the third consolidated and amended complaint and reasserted their due process claim.  Defendants moved for summary judgment on the claim, noting this Court's prior dismissal of the claim.  (Def. Inj. Mem. 89.)  Plaintiffs make no attempt to support their due process claim in response to defendants' motion.  Therefore, the claim has been both dismissed by the Court and abandoned by plaintiffs.

## VI.  Plaintiffs' Individual Damages Claims

In addition to asserting class and individual claims for injunctive relief, thirty-eight named plaintiffs present separate claims for individual damage awards related to harms allegedly resulting from defendants' double-celling policy.  While much of the above discussion regarding the applicable law would apply with equal force to plaintiffs' damages claims, each claim for damages by each individual defendant is a distinct § 1983 action.  However, plaintiffs frustrate this individualized inquiry by predicating each individual plaintiff's claim on the existence of a system-wide policy of double-celling, which they claim is unconstitutional with respect to *every* inmate.

As discussed above, plaintiffs have failed to produce sufficient evidence to show that defendants' double-celling policy is unconstitutional as a general matter.  However, nothing in this Court's opinion forecloses plaintiffs from showing that, with respect to particular plaintiffs in particular circumstances, double-celling *may* result in a violation of an inmate's constitutional rights.  Indeed, based on a review of the record, and plaintiffs' difficulty in producing evidence to support class-wide relief, an individualized inmate-by-inmate approach to double-celling

claims would seem to be more appropriate than the generalized class approach adopted by plaintiffs. Unfortunately, the record before the Court does not contain evidence that would allow for such an individualized inquiry

Plaintiffs' reliance on a theory of a class-wide constitutional violation presents additional problems for individual plaintiffs. To obtain damages from an individual defendant, plaintiffs must show that the defendant was personally responsible for the deprivation of plaintiff's rights. Hernandez v. Keane, 341 F.3d 137, 144-45 (2d Cir. 2003). In a § 1983 action, a supervisor cannot be held liable for his subordinates under the doctrine of respondeat superior. Rather, a plaintiff must show that the defendant had some "personal involvement" with the alleged unconstitutional conduct. Id. This involvement can be established in the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) the creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Id. at 145.

In this case, the individual defendants against whom plaintiffs seek damages are the commissioner of DOCS and the superintendents of the various institutions. (Compl. ¶¶ 25-42.) A factfinder could conclude that these defendants had personal involvement with the implementation of the double-celling policy as a general matter. However, on the record before the Court it appears unlikely that a factfinder could conclude that these defendants had personal involvement with any of the *specific* instances of which individual plaintiffs complain. That is no doubt due to plaintiffs' reliance on evidence of class-wide violations; the record contains no

evidence that specific harms to specific plaintiffs resulted from specific constitutional violations.

The Court is loath to grant summary judgment on individual plaintiffs' damages claims when the record before the Court was not created with an eye toward the necessary individualized inquiry. Plaintiffs' damages claims were treated as tag-alongs to plaintiffs' class-wide claims, but the class-wide claims have not survived summary judgment. It is unclear whether material issues of fact exist with respect to any or all of the individual damage actions because the discovery record was not properly compiled with these issues in mind. Therefore, the Court will reserve decision on the individual plaintiffs' damages claims and schedule a conference at which the parties can discuss whether supplemental briefing on the individual claims is necessary, or whether plaintiffs will stand on the position, expressed in the present summary judgment record, that their rights were violated simply by the imposition of the general policies that have now been upheld by this Court against general challenge.

## CONCLUSION

Plaintiffs have not produced sufficient evidence for a finder of fact to conclude that defendants' policy and practice of double-celling violates the Constitution with respect to the class as a whole. Accordingly, it is hereby ordered that:

1. Plaintiffs' class claims for injunctive relief under the Eighth Amendment (First Cause of Action) are dismissed.

2. The individual plaintiffs' claims for injunctive relief under the First Amendment (Third Cause of Action) are dismissed.

3. Plaintiffs' class claims for injunctive relief and individual claims for damages under the Fourteenth Amendment (Second Cause of Action) are dismissed.

4.  The Court reserves decision on individual plaintiffs' claims for damages under the Eighth Amendment and the First Amendment (First and Second Causes of Action).

5.  The parties shall appear for a conference on Friday, June 30, 2006, at 4:00 p.m.


SO ORDERED.

Dated: New York, New York
      May 26, 2006

GERARD E. LYNCH
United States District Judge
